70 So.2d 650

### COLVIN v. STATE.

6 Div. 406.

Court of Appeals of Alabama.

June 30, 1953.

Rehearing Denied Aug. 11, 1953.

Beddow & Jones and G. Ernest Jones, Jr., Birmingham, and Skidmore & Finnell, Tuscaloosa, for appellant.

See, also, 36 Ala.App. 104, 53 So.2d 99.

Si Garrett, Atty. Gen., and Robt. Straub and Paul T. Gish, Jr., Asst. Attys. Gen., for the State.

HARWOOD, Judge.

James Ludwig Colvin and Luther Jerome Veazey were students enrolled in the University of Alabama. Each man had seen military service in World War II, Colvin in the Marine Corps, and Veazey in the Navy.

For several weeks they had shared an apartment, and until the occurrence about which this case centers the men had apparently been close friends.

On Easter Sunday, 1951 Colvin shot Veazey to death on a street in Tuscaloosa. Colvin was thereafter indicted for murder in the first degree.

Trial on the indictment resulted in a verdict of guilty of murder in the second degree, the jury imposing a sentence of fifteen years imprisonment in the penitentiary.

Judgment and sentence was entered and imposed pursuant to the verdict. The defendant's motion for a new trial being denied an appeal was perfected to this court.

The evidence shows that on the Saturday night before the Sunday on which the shooting occurred the deceased, Veazey, and friends, male and female, had had a party in the apartment shared by Colvin and Veazey. Colvin had not attended this party but had gone to a picture show, and had delayed his return to the apartment in order to miss the party.

Upon arriving at the apartment between 12:30 and 1:00 A.M. Colvin found Veazey and a friend. Both were drinking. Shortly Veazey announced he was going to scout the town and invited Colvin to go along. Colvin declined, announcing he was going to bed, and cautioned Veazey to be careful with an automobile which Colvin had procured for Veazey that afternoon from a U-Drive-It agency.

Colvin went to bed. After about an hour Veazey returned with several companions and the drinking party was resumed with the usual accompanying noises such as lond talking, loud music from a record player, etc.

Around daylight Colvin left his room and went to the living room of the apartment to try and break up the party. The deceased resented his attitude and some blows were struck. The appellant got deceased by the arm, twisted it and deceased sat on the floor. The deceased promised to break up the party.

Colvin returned to his room and locked the door. The deceased apparently became highly resentful and made attempts to get into Colvin's room, threatening what he would do to Colvin; that he was going to get a pistol in Colvin's room and kill him, and also stated he was coming in and would stab Colvin with a butcher knife. Finally the deceased and his companions left the apartment, and Colvin heard deceased tell his companions as they departed "Don't let this worry you, I am going to kill him. Let me take care of this my own way."

Colvin went to sleep. About 10:00 A.M. he was awakened by Bob Calhoun who informed him that the deceased had wrecked the U-Drive-It over near Ridgecrest and that the deceased was under a nearby house and out "cold," with a large knife in his belt.

Calhoun suggested they go and get deceased before the police found him. Colvin consented to this. Colvin testified that before leaving he put a 25 calibre automatic target pistol in his pocket, telling Calhoun

at the time he was doing so to prevent the deceased from getting it when he returned to the apartment.

The evidence tends to show that other acquaintances of deceased had found him under the house in a drunken condition and with a butcher knife in his belt prior to the arrival of appellant and Calhoun. This knife was taken from him just prior to the arrival of appellant and Calhoun at the scene in an automobile driven by Calhoun, but owned by Walker Byrd.

As deceased saw appellant in the automobile he again threatened appellant and renewed his avowals of his intention to kill the appellant. These threats continued during the ride back to the apartment.

At the apartment the appellant declined to go in with the others because of the deceased's attitude, and as appellant left the deceased yelled at him "I am going to kill you Jimmie Colvin. You had better get out of town."

In the apartment the deceased rummaged through the apartment and through appellant's personal possessions seeking the pistol, stating that if he found it he would kill the appellant with it.

When the appellant had left the apartment he was accompanied by Don Brutkiewicz. After discussion of the situation they visited a pre-law student who gave them the name and telephone number of Wagner Finnell, an attorney in Tuscaloosa.

After lunch at their fraternity house the appellant and Brutkiewicz left around 2:00 P.M. to go to see Mr. Finnell.

They proceeded down an alley or driveway going from the fraternity house to Thomas Street. It was near the intersection of these two streets that the shooting occurred, and it is at this stage of the occurrence that material contradictions appear in the evidence.

The principal witness for the State was Miss Willie White whose yard borders Thomas Street at the scene. Miss White and Mrs. Sam King were sitting on the lawn of Miss White's home chatting.

According to Miss White her attention was attracted toward the deceased when she heard the sound of metal scraping on gravel. Looking up she saw the deceased fall with a bicycle. She got up and walked to the edge of her yard and asked what was going on. The deceased extricated himself and walked toward the appellant, who was also approaching the deceased.

The appellant began firing a pistol at deceased as they approached. After the first shot or shots the deceased turned his body and went over against a nearby embankment. The appellant kept firing, and the deceased was on the ground when the last shot was fired.

Miss White did not hear any words spoken by either of the participants at any time, nor did she see any weapon of any sort in the hands of the deceased. She did however see a knife blade flash in deceased's coat pocket when he fell off the bicycle.

Mrs. King also testified for the State. Her testimony is meagre as to any real facts however, as upon hearing the first shot fired she ran for her small grandchild playing in Miss White's yard and did not see any of the rest of the affray.

Mrs. King did testify that she did not hear any noise of metal scraping on gravel, and that Miss White jumped up and asked "What's going on" after the first shot was fired.

The version of the shooting elicited from defense witnesses, including the appellant, was to the effect that as appellant and Brutkiewicz approached Thomas Street, on their way to see Mr. Finnell, Brutkiewicz told appellant, "Jimmie, there is Jack Veazey," and appellant stated "Look the other way. Lets go on, maybe he won't recognize us." Brutkiewicz continued to watch deceased and saw him put his left hand in his pocket while guiding the bicycle with his right hand. As appellant and Brutkiewicz turned into Thomas Street they heard the bicycle crash to the ground. Mr. George Ellis who was passing at the time testified that the de-

ceased threw the bicycle down and appeared angry.

Brutkiewicz looked around and saw the deceased approaching with a knife in his hand and called to appellant: "Watch yourself Jimmie, there he comes with a knife behind you."

Appellant turned and saw deceased approaching upon him with a drawn knife.

Appellant warned deceased not to come any closer as he had a gun and would shoot, but deceased continued to advance rapidly. When deceased was about ten feet away the appellant fired a shot intending to miss. The deceased continued his advance and appellant fired twice in rapid succession. The deceased crouched sideways, and put his left hand in his pocket, the knife being in right hand. Appellant then fired two more times, and deceased, who was on an incline, slumped and rolled down the incline to the sidewalk.

The appellant then went to deceased, and called for some one to call an ambulance and the police.

The defense introduced several witnesses who testified that deceased's reputation was bad for peace and quietude when he was drinking, and that at such times he had a reputation of being violent, quarrelsome, and turbulent.

Evidence was also introduced tending to show that the deceased was an expert knife thrower, and that he practiced this art frequently.

A case knife was found on or under the deceased's body at the time he was lifted into the ambulance.

One of the first witnesses presented by the State was Mr. Roy Jones, a police officer who arrived at the scene of the shooting a very few minutes after it occurred. Mr. Jones was accompanied by another officer, Mr. Marable. Jones testified that they saw the appellant at the scene and that Officer Marable took from appellant's pocket a pistol, later introduced in evidence as the death weapon.

On cross-examination of this witness he testified that the appellant had made a statement in connection with the homicide at the time the pistol was taken in possession by the officers.

Mr. Jones was then asked in respective questions if appellant had not stated that he had to do what he did; whether appellant had stated at that time that the deceased was armed at the time of the shooting; whether appellant had stated at that time that the deceased had threatened his life on innumerable occasions on that morning; and "what did he say to you then or immediately before he actually delivered the physical possession of the pistol over to you?"

To all of the above questions the court sustained the State's objections, and exceptions to such rulings were duly reserved.

■ The rule, crystallized by numerous decisions of the appellate courts of this State, is that where in examination of a witness a party brings out part of a transaction or conversation, the other party may inquire fully into the transaction or bring out the whole conversation on further examination. Kimbrell v. State, 18 Ala. App. 641, 94 So. 241; Stephenson v. State, 27 Ala.App. 122, 166 So. 620; Campbell v. State, 32 Ala.App. 461, 27 So.2d 220; Graham v. State, 233 Ala. 387, 171 So. 895; Richardson v. State, 237 Ala. 11, 186 So. 580; Wesson v. State, 238 Ala. 399, 191 So. 249; Key v. State, 240 Ala. 1, 197 So. 363.

■ Inferences adverse to the appellant arose from Officer Jones' testimony to the effect that a pistol was taken from appellant at the scene of the homicide. Clearly the questions seeking testimony which would tend to offset or neutralize these inferences were in order, and the court's action in sustaining the objections to such questions was erroneous.

The doctrine enunciated in the cases cited immediately above also necessitates the conclusion that the court erred in certain of its rulings during the examination of defense witness Bob Calhoun.

Calhoun had gone to the apartment shared by appellant and deceased around 10:00 A.M. on the Sunday· of the homicide. There he had informed appellant that the deceased had wrecked the U-Drive-It automobile and was lying under a nearby house. At Calhoun's request the appellant, with some reluctance because of what had gone on the night before, consented to go with Calhoun and try and get deceased away before the arrival of police.

Upon arrival at the scene of the wreck the deceased, with one foot in the door of the car in which appellant was sitting on the front seat, renewed his threats against the appellant.

During the cross-examination of this defense witness the record shows the following in reference to what appellant did just before he left the apartment to go to the scene of the wrecked U-Drive-It:

"Q. When you went up to Mr. Colvin's room and immediately after that you and Mr. Colvin and Mr. Brutkiewicz went down to where Jack Veazey was, what did Colvin put in his pocket before he left the room?

"Mr. Beddow: Just a minute. If they want to go into it all, we don't mind, but we object to remote testimony.

"Mr. Ward: We just asked what he did.

"Mr. Beddow: We object on the ground it is too remote; irrelevant, incompetent, immaterial and illegal testimony unless the Court will let us go into all of it.

"The court: I will let you go into this shooting.

"Mr. Skidmore: We except.

"Q. What did he put in his pocket be·fore he left there? A. A gun.

"Q. I will show you a little .25 caliber automatic pistol. In your best judgment, is that the gun? A. I saw it one time. I couldn't tell you. It was something like that.

"Q. It was a gun like that? A. Yes, sir. It was a small gun.

\* \* \* \* \* \*

"Q. After you left the apartment, you went down to where Veazey was? A. That is right.

"Q. And Veazey got in the automobile with Colvin? A. That is right.

"Q. How was Colvin sitting at that time? A. In the front seat, in the middle next to me. He had his back to Veazey until Veazey got in the car, then he turned around from the dash board.

"Q. At that time, Colvin had the loaded gun in his pocket? A. That is right.

"Q. You think it was the inside coat pocket? A. Yes, sir.

"Q. He turned around to face Veazey at that time? A. That was because—

"Q. I am not talking about because. He turned around to face Veazey; is that right? A. Yes, sir."

The record further shows the following ruling during the redirect examination of Calhoun:

"By Mr. Beddow:

"Q. Now, you were asked the question: Isn't it a fact Jimmie Colvin had turned in the seat in which he was sitting and sat with his face turned toward Veazey after Veazey got in the automobile. I want you to tell these gentlemen if it isn't a fact that at the time Jimmie Colvin put that pistol in his pocket in his apartment if he didn't make the statement that Veazey had looked for that pistol the night before and he told him he would have killed him with it if he had found the pistol and found the clip, and he was putting the pistol in his pocket because if Veazey came in he might get it and kill him?

"Mr. McDuffie: We object.

"The Court: Sustained.

"Mr. Skidmore: Except."

■ The inferences adverse to appellant brought out by the cross-examination of Calhoun in reference to appellant arming himself at the time he left the apartment are obvious. The court therefore erred in sustaining the objection to the question on redirect-examination seeking testimony explanatory of the entire transaction, a part of which was brought out by the State.

Such testimony was highly corroborative of appellant's version, and should have been allowed.

Numerous other points are argued as constituting error in the brief submitted in behalf of the appellant. Being of the conclusion that the above points already written to necessitate a reversal of this cause, and it being further our opinion that the additional points set forth in appellant's brief are not likely to arise on another trial of this cause we pretermit consideration of them in the interest of brevity.

Reversed and remanded.