515 So.2d 121 (1987)
Paul Dewayne HANDLEY
v.
STATE.
6 Div. 360.
Court of Criminal Appeals of Alabama.
June 30, 1987.
Rehearing Denied July 28, 1987.
Certiorari Denied October 16, 1987.
*123 George C. Lucas, Ronda H. Lacey, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and Rivard Melson, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 86-1414.
PATTERSON, Judge.
Paul Dewayne Handley, appellant, was indicted for the offense of "murder by the defendant during sodomy in the first ... degree or an attempt thereof committed by the defendant." Ala.Code 1975, § 13A-5-40(a)(3). The indictment, in pertinent part, reads as follows:
"PAUL DEWAYNE HANDLEY ... did intentionally cause the death of Denise Madolyn Murphree, by stomping her with his feet, kicking her with his feet or by means otherwise unknown, and PAUL DEWAYNE HANDLEY caused said death during the time that PAUL DEWAYNE HANDLEY, a male, was engaging or attempting to engage in deviate sexual intercourse with Denise Madolyn Murphree, a female, by forcible compulsion, in violation of § 13A-5-40(a)(3), of the Code of Alabama, 1975 ...."
He was arraigned and pleaded not guilty. A jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury in accordance with § 13A-5-46, and the jury returned a unanimous advisory verdict recommending a sentence of life imprisonment without parole. Thereafter, the trial court held a sentencing hearing in accordance with § 13A-5-47, adopted the recommendation of the jury, and sentenced Handley to the penitentiary for a term of life without parole.
Sometime during the late hours of February 20, 1983, or early morning hours of February 21, 1983, Denise Madolyn Murphree was killed in her home in Trussville, Alabama. The victim was the sister-in-law of appellant. Appellant and his wife lived next door to the victim's residence. The medical testimony revealed that the victim died as a result of a severe beating and stomping which caused the victim to sustain a ruptured liver and other severe internal injuries. In addition, the victim had been stabbed, slashed, mutilated, and sodomized.
Appellant does not question the sufficiency of the evidence to support his conviction, and it would serve no useful purpose to recite the evidence in detail in this opinion; however, we will set out facts where we deem it necessary for a better understanding of the issues raised. Although the evidence of guilt was circumstantial, there was ample legal evidence presented by the State from which the jury by fair inference could find appellant guilty. The State's evidence disclosed that appellant was in the area where the crime was committed around the time of the commission of the crime; that, on the morning following the murder, he had scratches on his neck and blood, the same type as the victim's, on his trousers; that blood was found under his fingernails and on his underwear; that the treadmarks on his jogging shoes were similar to the treadmarks on the victim's body, and there was blood consistent with the victim's on the soles of *124 those shoes; that his fingerprints and a palmprint were found on the hardwood floor near and under the victim's body; that pubic hair similar to appellant's was found under the body; that appellant's shirt, smeared with blood and semen, was found in the woods behind appellant's residence; that semen found on the victim and in the victim's room was that of a person having the same blood type as appellant; and that bite marks found on the victim's body were similar to impressions taken of appellant's teeth. Appellant denied his guilt and attempted to explain how his fingerprints and palmprint could have gotten in the victim's room and how the blood could have gotten on his trousers when he testified he went into her room the morning after her killing. The conflicts in the evidence were for the jury to resolve, and there was sufficient evidence from which the jury could have excluded every reasonable hypothesis except that of guilt beyond a reasonable doubt. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). In fact, we find from our review of the record that the evidence of guilt was strong and convincing.
Four issues are raised by appellant on appeal.

I
Appellant first contends that the trial court erred in allowing his former wife to testify against him concerning her observations of his physical appearance and his ownership of a beige long-sleeved shirt, over his objections that his former wife's testimony violated his rights relating to the confidential marital communications privilege. He relies principally on Arnold v. State, 353 So.2d 524 (Ala.1977).
The shirt in question had been found, on the afternoon following the murder, hanging in a tree behind appellant's residence and close to the crime scene. The shirt was described as a long-sleeved "tee-shirt" with the words "Joel's Varsity Restaurant" printed on it. Appellant had previously worked at Joel's Varsity Restaurant and had been given two of the shirts. Semen and blood stains were found on the shirt. Appellant's former wife, Donna Murphree Handley, testified that the shirt belonged to her former husband, appellant. She also testified that she observed appellant wearing the shirt early on the night of the murder and that, when he returned to their residence at approximately 3:10 a.m. and entered the back door, he was not wearing a shirt, but was naked from the waist up.
Appellant and Donna Murphree Handley were married at the time of the murder, but were divorced prior to the trial of the instant case. The divorce did not affect or impair the principle of privileged communications between them. Arnold v. State. The question to be decided here is the applicability of the privilege for confidential communications to the matters observed and testified to by Mrs. Handley over appellant's objection.
"By its nature, the privilege includes only those statements or acts made or performed by one party to the marriage in communicating with the other. It is the confidential nature of this day by day interchange between the husband and wife, made as a natural consequence of the peculiar relationship of marriage, which falls within the proper scope of the privilege."
Arnold v. State, 353 So.2d at 526-27.
The privilege for confidential communications between spouses is discussed in C. Gamble, McElroy's Alabama Evidence, § 103.01(4) (3d ed. 1977), as follows:
"Although a husband or wife may be competent to take the stand against his or her accused spouse in a criminal prosecution, the witness spouse will still be unable, with few exceptions, to divulge confidential communications that transpired between the two of them. The historic justification for the privileged communications rule is to encourage family harmony by fostering communication between spouses.
". . .
"The privilege for confidential communications between spouses applies not only to statements but also to knowledge acquired by one spouse's observation of *125 an act of the other in private if the circumstances indicate that the actor-spouse did the act in the presence of the other spouse solely because of the confidence normally inspired by the marriage relation. Stated differently, the privilege applies to exclude all knowledge coming to the witness spouse by reason of the relationship and which, but for the confidence growing out of it, would not have been known.
"In determining whether the privilege is applicable in a given case, the proper inquiry is whether the communicating spouse intended the communication or act to be confidential. The privilege does not cover a communication or transaction between husband and wife which manifestly was not confidential or which must have been intended to be made public.
". . .
"The privilege for confidential communications between spouses continues after the marriage has been dissolved as by death or divorce." (Footnotes omitted.)
For further general discussion, see State v. Browder, 486 So.2d 504 (Ala.Cr.App.1986).
The act of appellant of wearing the shirt described above, on the evening of the murder, as well as his ownership of such a shirt, did not constitute a confidential marital communication and, hence, it was proper for the trial court to admit the testimony of the former wife that he owned such a shirt and wore it on the date of the murder. Numerous persons obviously knew that appellant owned and had worn such a shirt; the shirt had been given to him by his former employer and he wore the shirt in the presence of his friend Greg Ballew on the night of the murder. The spouse's knowledge that her husband owned such a shirt and wore it on the night of the crime was in no sense traceable to their relation of husband and wife and the confidence that the relationship inspires. Rather, such information was accessible to third persons. This conduct was just as likely to occur before the public as in private and, indeed, it did. Owen v. State, 78 Ala. 425 (1885). Likewise, her testimony identifying the bloody shirt found behind the couple's home as belonging to her husband did not come within the prohibition of the law relative to communications made between the wife and husband during the marital relation. "The essence of the privilege is to protect confidences only." 8 Wigmore, Evidence § 2336 (McNaughton rev. 1961) (emphasis in original). Clearly, the circumstances surrounding the observation of the cited information rebut any claim that confidentiality, in the marital sense, was intended.
We further find that the act of appellant in entering his home without a shirt and naked from the waist up, around 3:10 a.m. on the morning of, or following, the murder, under the circumstances of this case, did not constitute a confidential marital communication, and the admission of this testimony by the former spouse was proper.
"The privilege has for its object the security from apprehension of disclosure a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to communications, not to acts which are in no way communications....
"Nevertheless, the statutes in some jurisdictions extend the privilege to knowledge of any fact acquired in the marital relation. There is at first sight some plausibility in this extension. The confidence, it may be argued, which the husband or wife desires, and the freedom from apprehension which the privilege is designed to secure, must be supposed to be equally desirable for noncommunicative conduct as for communications.
"The difficulty with this argument is that it goes too far. The rationale of the privilege is clearly inapplicable to a case, for example, where the wife, unknown to the husband, observes him disposing of a dead body in the outhouse. Since the husband did not take the wife into his confidence, it would be nonsense for the tribunal to deprive itself of the wife's evidence on the ground that compulsory *126 disclosure in such cases would discourage marital confidence.
"At the other extreme, and properly within the privilege, however, are acts which are clearly intended to be confidential communicationsfor example, the conduct of a husband who brings home a package of valuables and, calling his wife's attention, says `Note where I put this package' as he places it in the fourth desk drawer. He communicates to her not only the words but also the act of placing the package.
"The difficult cases are the in-between onesthose in which the act is done with the knowledge that the spouse is observing it but is not a mere substitute for words.... To formulate a precise test would perhaps be impracticable. In some casesthose in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are other indications that he intends for her to acquire knowledge of his actthe act is as much a communication as his words to her describing the act would be. Such an act falls within the policy of the privilege. In other cases, howeverthose in which the act is done solely for the sake of doing it, the indications being that the husband is indifferent to the presence of the wifethere is no communication and the marital confidence aspect of the act is likely to be slight. In such cases the privilege should not be allowed to deprive the court of the evidence."
Wigmore at § 2337 (emphasis in original, footnote omitted). The application of these principles is exemplified by Smith v. State, 198 Ind. 156, 162-63, 152 N.E. 803, 805-06 (1926), wherein, in the prosecution of the defendant for murdering his mother-in-law, the wife testified that she observed her husband push a wheelbarrow with a trunk on it to the outdoor toilet and dump something out of the trunk into the toilet. In determining that this testimony was properly admitted, the supreme court stated the following:
"[A]ctions, to gain shelter under the exception of the statutory rule here, must be clothed with that secrecy and intimate relation peculiar to the married state.
"In the case at bar, appellant was not acting in the confidence of his spouse, because he shielded the contents of the trunk from her knowledge. For aught that she knew from the act, the trunk might have contained any kind of rubbish. The manner in which the acts were performed indicates that they were not intended to be confidential communications to the wife. It seems the proper construction to place upon the acts is that they were intended to be not confidential between them, and that appellant by them did not seek the shelter of the intimacy of the marital relation."
Id. at 163, 152 N.E. at 806.
In the instant case, it can reasonably be inferred from the evidence that appellant discarded the bloodstained shirt in the woods behind his house before entering the house in order to conceal from his wife his involvement in the murder and sodomy of her sister. It is apparent that appellant's conduct in coming in without a shirt was not done solely because of the confidence normally inspired by the marriage relation, nor can it be reasonably contended under the circumstances that he intended the act to be a confidential marital communication. Instead of being induced by marital confidence, the "act" of coming in without wearing a shirt was induced by appellant's effort to avoid taking his wife into his confidence. Moreover, it is clear that appellant did not invite her presence or attention. It is reasonable to conclude that appellant intended to slip into the house unnoticed by his wife and in the hope that she was asleep. His appearance came to her knowledge merely by the circumstance of her presence, and it does not seem reasonable, when examining all the facts, that it resulted from the relation she sustained to him. We conclude that appellant's wife's observation was not intended by appellant to be a confidential communication.
We find another reason to deem appellant's contention to be without merit: An examination of the testimony of the former wife discloses that the facts that *127 appellant owned a shirt similar to the incriminating one and that he was wearing it on the night of the murder were first brought out on defense counsel's cross-examination of appellant's former wife.[1] Thus, it was the defense that injected the issue of the shirt and whether appellant wore it on the night of the murder. There had been no testimony about the shirt before defense counsel brought out the following:
"Q. But are you saying that the tee-shirt that he had on when he came back [to his residence from the mini-mart on the afternoon prior to the murder] is different from the tee-shirt he had on when he left to go to the mini-mart or is it the same one?
"A. Different one.
"Q. Okay. You are saying he changed shirts from the time he left the house to go to the mini-mart
"A. No, sir. I was up at my sister's house [on Sunday, February 20, 1983] and he had to go down to his house, our house, and change shirts down there and then he
"Q. When did he go down to the house and change shirts?
"A. Before he went to the mini-mart.
"Q. Now, when he left to go to the mini-mart, what kind of shirt did he have on?
"A. Well, I didn't see him then, I just asked him when he got back and he said he changed before he went to the mini-mart.
". . .
"Q. Now the shirt that he came back with, was it the one that had the restaurant's name wrote on it? Was it the one that had the restaurant's name wrote on it, did he have that one on when he came back?
"A. Yes, sir.
"Q. That the shirt that he had on [sic] he came back with Greg Ballew [after having come back from the mini-mart and having left again to get Ballew] was the shirt that had the restaurant name on it and long sleeves?
"A. Yes, sir."
While still on initial cross-examination, defense counsel also brought out the following:
"Q. Now, the next morningoh, just one question: I asked you a moment ago aboutlet me ask you this question: When you got up the next morning, could you see your husband's clothes laying there on the floor beside the bed?
"A. There are a lot of clothes.
"Q. There was a lot of clothes?
"A. Un-huh.
"Q. Do you remember seeing the clothes on the floor that he had on, do you remember seeing the clothes on the floor or can you remember?
"A. I believe I seen his pants on the floor.
"Q. What about the shirt that you told the police he had on Monday morning [, the morning after the murder,] when he came up to the house, up to your Momma and Daddy's house? Think about it and tell me what kind of shirt he had on when he came up to your mother and father's house Monday morning?"
The trial judge was of the opinion that these questions and answers had raised an inference that the tee-shirt in question may have been among the scattered clothing on the floor, i.e., that defendant had pulled the shirt off in the bedroom after he came home around 3:10 a.m. and dropped it on the floor, but the witness just did not see it or notice it when she got up the next morning. In this regard, the record shows the following:
"MR. LUCAS [defense counsel]: One other thing regarding the opening [of] the door, we would object to that ruling by the Court, I think after the record, if the record was read back, you would find that Mr. Sheffield [defense counsel] specifically limited his questions about what *128 Mr. Handley, the type clothing Mr. Handley had on to specific periods of time involved and at no time did he ask Mrs. Handley what he had on when he came home at three ten in the morning, I think the record will bear us out on that.
"THE COURT: I think it is fair to say that you can't ask questions and leave an inference, an incorrect inference, he asked about the clothes on the floor next to the bed as if that was what was put there when he came in that night, and what was worn the next morning, what was worn away from the house that night, he has talked about that shirt in every way you can talk about it, he has talked about clothes every way you can talk about it
"MR. LUCAS: I don't believe he has talked about the lack of the shirt
"THE COURT: He asked what clothes were found on the floor next to the bed that next morning, and then what was worn to the house when his wife called him up to the sister-in-law's house. I overrule your objection."
Defense counsel was the first to inject into the trial the description of the shirt defendant was wearing the night of the murder and the whereabouts of the shirt the next morning. Defense counsel was clearly trying to suggest to the jury that appellant's shirt may simply have gone unnoticed in the clutter of clothing on the bedroom floor. We believe that appellant opened the door for the State to permissibly question the wife as to whether appellant was wearing the shirt when he entered their home at approximately 3:10 a.m., after the murder had been committed.
Where a defendant first injects a matter into a trial by examination of a witness, the prosecution may examine the witness as to details of the matter although such examination by the prosecution would otherwise be improper. Bryson v. State, 57 Ala.App. 278, 327 So.2d 916 (Ala.Cr.App.1975), cert. denied, 295 Ala. 393, 327 So.2d 919 (Ala. 1976); McClendon v. State, 54 Ala.App. 327, 307 So.2d 723 (1975); Colvin v. State, 37 Ala.App. 268, 70 So.2d 650 (1953), aff'd, 260 Ala. 338, 70 So.2d 654 (1954).
Moreover, assuming, arguendo, that the admission of the testimony of the wife concerning the appellant coming home without a shirt was error, in view of the clearly admissible testimony that appellant was wearing the shirt on the night of the murder and that the bloody shirt found behind the house was in fact the shirt he had worn the night of the murder, it was error without injury. Rule 45A, A.R.A.P.
For the above reasons, we find no merit to this contention.

II
Appellant next contends that he was denied due process of law by the State's intentional suppression of exculpatory evidence. He relies on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant specifically complains of the State's failure to produce the criminal record of William H. Brown, who was not called as a witness. We glean from the record that, during the investigation of the murder, Brown had apparently given a statement to the police to the effect that appellant had told him, while on a fishing trip with appellant on the Friday prior to the murder, that appellant was sexually attracted to the victim or intended to have sex with her. The prosecuting attorney asked appellant about these conversations with Brown, during cross-examination at trial, and appellant denied them.
Appellant's counsel now claims that he has discovered since trial that Brown had several criminal convictions, including one for sodomy. However, the State's attorney testified at a hearing on an A.R.A.P., Rule 10(f) motion that the prosecutor had no information of Brown's having a record of criminal convictions. Moreover, the record contains no evidence that William H. Brown had any criminal record. The exhibits attached to the appellant's brief showing convictions of a William Brown are not part of the record below. The assertions and arguments in brief which have no factual basis in the record cannot be considered by us. Moore v. State, 457 So.2d 981 (ALa.Cr.App.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 *129 (1985). Not only is there nothing before us to consider, but we cannot conceive of any way that the alleged suppressed information would have been beneficial to the defense. The record certainly does not show that this alleged evidence was material. See Knight v. State, 478 So.2d 332 (Ala.Cr. App.1985).
We find no merit in this contention.

III
Appellant challenges the trial court's admission, over proper objection, of the testimony of a dental expert who analyzed bite marks found on the victim's body, compared them to appellant's dentition, and concluded that they were similar to impressions of appellant's teeth. Bite mark analysis seeks to identify persons by comparing their dentition, i.e., the kind, number, and arrangement of their teeth, to a bite registration in flesh or other material. The technique is a specialized subset of forensic odontology, which is the application of dentistry to the law. See Note, The Admissibility of Bite Mark Evidence, 51 S.Cal.L.Rev. 309, 309 (1978).
Appellant's argument is based on a principle articulated in the leading case of Frye v. United States, 293 F. 1013 (D.C.Cir. 1923): The general rule that the admissibility of scientific evidence requires a preliminary showing of general acceptance in the scientific community. In Frye, the defendant had offered polygraph evidence tending to show his innocence. The court found that polygraph theory and the device itself were not sufficiently generally accepted by the scientific community. Id. at 1014. Appellant argues that the technique of bite mark comparisons is not accepted by the scientific community and, thus, is contrary to the Frye standard.
At trial, the State presented Dr. Mario G. Martinez, an expert in the field of odontology, who testified on the subject of bite mark identification. Dr. Martinez is a practicing dentist and professor of pathology and dentistry at the University of Alabama School of Dentistry. In addition to having many years' experience in dental practice and teaching, Dr. Martinez is Director of the Division of Oral Pathology at the dental school; Deputy Medical Examiner with the Jefferson County Toxicology Department; teacher of forensic dentistry, including bite mark identification; and author of numerous articles which were published in scientific journals dealing with the subject of dental pathology.
Dr. Martinez testified to the following: On February 21, 1983, he examined the body of the victim and found two bite marks on the left breast. He made photographs of the bite marks and, also, made impressions of the bite marks by covering them with a soft material that hardens. The bite mark impressions were then used to make a plaster model. A second set of impressions was taken from the body on February 22 for control purposes. Dental impressions of appellant and two other suspects were taken on February 22, and plaster models were made from those impressions. The suspects also bit wax wafers to give impressions of their bites for the purposes of determining occlusions or relations of upper to lower teeth. Photographs were made of the following: (1) the plaster models of the bite mark impressions; (2) the biting edge of the plaster models of the teeth of the three suspects; and (3) the wax wafer bite marks made by each suspect. Transparent overlays were made of all the photographs, including the photographs of the actual bite marks on the body.
Dr. Martinez then used the plaster models, photographs, and overlays to make comparisons between the teeth of the suspects and the bite marks on the body. All the photographs, overlays, and models were exhibited to the jury, and Dr. Martinez explained and pointed out how the comparisons were made.
Based on these comparisons, it was Dr. Martinez's opinion that the bite marks on the body were consistent with appellant's teeth and inconsistent with those of the other two suspects. Dr. Martinez found eleven points of similarity between appellant's teeth and the bite marks and found no dissimilarities. Significantly, appellant had a front tooth missing which was consistent *130 with a gap in the bite marks. He also had a front tooth that had been ground down in preparation for a crown, which was consistent with one tooth imprint being more shallow than the imprints made by adjacent teeth in the bite marks. Two teeth marks in the bite marks left significant and measurable imprints of the lengths of their cutting edges, and measurements from the bite marks matched lengths of the cutting surfaces of the corresponding two front teeth of appellant. Another match between appellant's teeth and the bite marks was the curvature of the dental arch. In addition, the bite marks also displayed the feature of one of appellant's teeth, that being that the front edge of the cutting surface was significantly higher than the back edge of the cutting surface.
This court has applied the Frye standard in several cases. In Prewitt v. State, 460 So.2d 296 (Ala.Cr.App.1984), we applied Frye principles in ruling that hypnotically induced testimony is not admissible. In Wynn v. State, 423 So.2d 294 (Ala.Cr.App. 1982), we restated the Alabama position of rejecting evidence derived from polygraph examinations on the basis of the Frye standard. In Hill v. State, 507 So.2d 554 (Ala. Cr.App.1986), we applied Frye standards in ruling that testimony of a clinical psychologist concerning "battered wife syndrome" was inadmissible (but see Ex parte Hill, 507 So.2d 558 (Ala.1987), denying certiorari but expressing a different opinion.)
In one case involving circumstances closely analogous to those now before us, our supreme court has rejected the applicability of Frye. In Ex parte Dolvin, 391 So.2d 677 (Ala.1980), the court specifically held Frye to be inapplicable when expert evidence is in the nature of physical comparisons as opposed to scientific tests or experiments.[2] In Dolvin, a forensic odontologist was allowed to express an opinion about the identity of skeletal remains based upon his comparison of the dental features of the skeleton with inter vivos photographs of the murder victim. The witness in Dolvin "compared facial structure, occlusion, and the shape of the teeth and jaw of a human skull ... with those of [the victim] as depicted in inter vivos photographs taken of [the victim]." Id. at 679.
Here, as in Dolvin, there was no scientific test or experiment. Rather, there was a physical comparison, as in Dolvin. In Dolvin, the court pointed out the following:
"Alabama case law supports the admission of inter vivos photographs for the purpose of allowing the jury to compare the teeth of a human skull with those of the person depicted in the photograph. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183 (1943). Expert testimony comparing inter vivos photographs with a human skull is a refinement and extension of this procedure, but is nonetheless admissible, assuming a proper predicate [of expertise] is laid."
Id. at 679-80.
In a recent bite mark case of first impression in the State of Wisconsin, the court of appeals observed the following: "Currently, bite mark comparison has received evidentiary acceptance in nineteen jurisdictions. No jurisdiction has rejected the admission of such evidence." State v. Stinson, 134 Wis.2d 224, 228, n. 2, 397 N.W.2d 136, 137, n. 2 (1986). One of those jurisdictions which accept such testimony is Florida. The Supreme Court of Florida recognizes the Frye standard, but in the recent case of Bundy v. State, 455 So.2d 330, 349 (Fla.1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986), rejected the applicability of Frye to the admission of bite mark comparison and stated the following:
"The evidence in question is based on the examination of impressions made by human teeth and their comparison with models of known human teeth for the purpose of determining whether the impressions were or probably were or could have been made by a particular individual. Bite mark comparison evidence differs *131 from many other kinds of scientific evidence such as blood tests, `breathalyzer' tests, and radar (as well as from inadmissible techniques such as the polygraph and voice-print analyses) in that these various techniques involve total reliance on scientific interpretation to establish a question of fact. With bite mark evidence, on the other hand, the jury is able to see the comparison for itself by looking directly at the physical evidence in the form of photographs and models. People v. Slone, 76 Cal.App.3d 611, 143 Cal.Rptr. 61 (Cal.Ct.App.1978); People v. Marx, 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (Cal.Ct.App.1975)."
See also People v. Milone, 43 Ill.App.3d 385, 2 Ill.Dec. 63, 356 N.E.2d 1350 (1976); Niehaus v. State, 265 Ind. 655, 359 N.E.2d 513, cert. denied, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977).
Based upon our own precedent and the persuasiveness of other jurisdictions' rulings, we, too, hold that the admissibility of the dental witness's bite mark comparison does not depend on meeting the Frye standard. In the instant case, the jury itself was able to look at photographic overlays of the plaster models of the bite marks and of appellant's teeth. Moreover, it had the plaster three-dimensional models of both the teeth and the bite marks for comparison, as did the witness. By looking directly at the physical evidence used, the models and the photographs, the jury was able to judge for itself whether or not appellant's teeth were similar to or did in fact match the bite marks found on the victim's body. Moreover, we find that the proper predicate for the admission of this expert testimony pertaining to bite mark comparison was laid, for the testimony establishes that there is no question that Dr. Martinez was eminently qualified as an expert in the field of forensic odontology. See Dolvin v. State, 391 So.2d at 680-81. The general rule is that the competence of an expert witness to testify is an inquiry substantially within the discretion of the trial judge, and the appellate court will not disturb the trial judge's determination of expert qualifications unless there is a clear abuse of this discretion. Reynolds v. State, 346 So.2d 979 (Ala.Cr.App.), cert. denied, 346 So.2d 986 (Ala.1977). We hold in the instant case that the trial court did not abuse its discretion in admitting this evidence.

IV
Appellant's final contention is that he was denied effective assistance of counsel by not having, before trial, the detailed report of Dr. Martinez's bite mark comparison. We disagree. The trial of this case began August 29, 1983, and lasted two weeks. On July 13, 1983, defense counsel was furnished a report from Dr. Martinez stating his conclusions as to the comparisons of the bite marks on the victim's body with appellant's teeth. Sometime before July 29, 1983, defense counsel interviewed Dr. Martinez for a considerable period of time about his expected testimony. It appears that a more detailed report of Dr. Martinez's findings was delivered to appellant's counsel on the third day of trial. Appellant's accusation that the prosecutor intentionally withheld this report from him is not supported by the record. It is obvious that the prosecuting attorney delivered the more detailed report to defense counsel as soon as he received it himself. Appellant asserts that, due to the late delivery of the detailed report, he was unable to adequately prepare for the cross-examination of Dr. Martinez. The record does not support this assertion. The cross-examination was extensive and thorough. It was professionally done. It demonstrated that defense counsel had a thorough knowledge of the facts of the case, an understanding of the field of forensic odontology and the techniques of analysis of bite marks, and a full awareness of the case law and treatises on the subject. Defense counsel's performance belies his assertion on appeal that he was not prepared. Moreover, appellant has failed to show that he was prejudiced in any way in receiving the detailed report three days into the trial. He has not demonstrated that the outcome of the trial probably would have been different if he had had the detailed report earlier. He has not shown that he was denied effective *132 assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Having considered all issues raised by appellant and finding no error, we conclude that this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.

On Application for Rehearing
PATTERSON, Judge.
On application for rehearing, appellant is represented by newly appointed counsel, who did not participate in his trial. Counsel requests that, due to the length of the record and time restraints, we permit the filing of appellant's brief on original submission as appellant's brief on application for rehearing or grant additional time for the filing of a brief. Appellant raises no new issues in his application for rehearing, and all issues raised were fully addressed by us in our opinion of June 30, 1987, affirming the case. As the application for rehearing only asks us to reconsider our prior holding, appellant would derive no benefit from the granting of additional time, since a new brief would simply address the same issues previously and thoroughly briefed. Under these circumstances, we do not deem a new brief necessary.
In considering the application for rehearing, we have reviewed our opinion and decision of affirmance and considered appellant's brief filed on original submission, as requested, and we are not persuaded to alter our holding.
OPINION EXTENDED; APPLICATION OVERRULED.
All Judges concur.
NOTES
[1] Although an examination of the prosecution's questioning of Mrs. Handley reveals that she was questioned on whether the police showed her a shirt or a photograph of a shirt and that she answered in the negative, we do not consider this isolated and obscure questioning to have injected the specific facts brought out by defense counsel.
[2] See also Prewitt, 460 So.2d at 302, wherein the court recognizes, in dicta, that the Frye test does not apply to forensic odontology comparisons.