[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 553 
Curtis Christopher Brown was indicted for the assault on his wife, C.B., in violation of § 13A-6-22, Code of Alabama 1975; the attempted murder of his stepdaughter, J.H., in violation of § 13A-4-2, Code of Alabama 1975; and child abuse in violation of § 26-15-3, Code of Alabama 1975. He was found "guilty as charged in the indictments." He was sentenced to 10 years in prison for attempted murder and 10 years in prison for child abuse, the sentences to run concurrently. He was also sentenced to six months in prison for third degree assault, also to run concurrently with the sentence for the attempted murder. He raises six issues on appeal.
The record reveals that C.B. and the appellant were married and living together at the time of the offenses. C.B.'s daughter, J.H., also lived with them. J.H. is severely mentally retarded and has cerebral palsy. C.B. testified that J.H. went to bed at around 8:00 p.m. on September 7, 1989. C.B. also went to bed sometime after that. She testified that the appellant was awake and was watching television when she went to bed. C.B. testified that she woke up when she heard a sound coming from her daughter's room. She stated that it sounded as if her daughter was "violently throwing up." (R. 18.) She testified that she went to J.H.'s room and that the appellant was "standing over her with one knee on the bed, his right knee on the bed and his left foot on the ground, and he had both of his hands over her face, over her mouth and nose, bearing down just as hard as he could on her." (R. 19.) C.B. yelled, turned on the light, and ran to the bed. She testified that J.H.'s mouth was "busted," that her face was red and that she was screaming. (R. 20.) She further testified that the appellant yelled, "I'm doing this for you, I'm doing this for us. She's nothing but a worthless imbecile." (R. 20.)
C.B. testified that she grabbed J.H. and tried to run out of the room. The appellant threw them down on the bed. He grabbed J.H. by the hair and threw her across the room. The appellant knocked C.B. down, and they fought. He pushed her into her darkroom and tried to lock her in. The appellant then threw her on the ground and began choking her. She further testified that the appellant continued to bang her head on the ground. C.B. testified that at one point she was able to get free, but that the appellant grabbed her again and threw her on the couch. The appellant continued to hit J.H. C.B. testified that the appellant got some wide tape, and that he sat on top of her and tried to tape her hands behind her. The appellant called to J.H. and told her that her mother wanted a kiss. When J.H. came over, he knocked her down. She testified that the appellant stated, "I've been trying to kill her and I've been trying to kill you and beating y'all up, and she's so stupid she'll just come right over to me." (R. 25.) The appellant called J.H. again and then threw her back when she came to him.
C.B. testified that eventually the appellant took J.H. to her room and put her in her bed. The appellant became very calm and sat on the couch. When the appellant fell asleep on the couch, she got J.H. and they left the house. They went to Sabin Bokus's house. His phone had been disconnected, so they went to a phone booth and called Penelope House, a home for abused women. C.B. then went to the police and reported the incident. The police took her and J.H. to the University of South Alabama Medical Center. After the incident, she and J.H. stayed at her parents' house until she could find a safe place to live.
C.B. further testified that the appellant had been bothering her for weeks to get *Page 554 
her to give up custody of J.H. The day before the incident he had called the Department of Human Resources (DHR) and tried to find an alternate placement for J.H.
Lisa Anne Lowry Smith, a pediatric resident at the hospital, testified that J.H. had multiple bruises on her trunk and extremities, a laceration of her upper lip, and multiple scratches and abrasions. David Hardin, a resident in orthopedic surgery at the hospital, testified that J.H. had a cortical defect fracture on one of her hands.
Raymond Dickson, a corporal with the Mobile Police Department, was on duty when C.B. reported the incident. He took them to the hospital and called a juvenile officer. He testified that both C.B. and J.H. were bruised, battered, and bleeding. Robert English, an officer in the identification section of the Mobile Police Department, testified that there was a glue-like substance on the clothes that C.B. was wearing on the night of the incident. Tape with hair stuck on it was found at the scene. The State also introduced photographs of tape found in the living room trash can.
Sabin Bokus testified for the appellant. He testified that C.B. and J.H. came to his house at approximately 11:00 p.m. on September 7, 1989. C.B. had bruises and a gummy substance on her wrists. J.H. did not appear to be upset. He suggested that C.B. call Penelope House. After she called Penelope House, they went to the police station. The appellant also called several character witnesses who testified as to the appellant's reputation for honesty and his nonviolent nature.
The appellant testified that on the night of the incident, J.H. went to bed at around 9:00 p.m., and his wife went to bed at 9:15 p.m. He was watching television. J.H. came back into the living room at around 10:00 p.m. J.H. had insomnia and would get up three or four times a night. He picked her up and put her back in bed. She came back into the living room a few minutes later. He took her immediately back to bed. She kept sitting up. After she sat up several times, he "popped" her on the chest. (R. 216.) He hit her twice with his open hand. He testified that he did not intend to hurt her. The appellant further testified that he yelled at J.H. to go to sleep and that she started to cry. He picked her up and then sat beside her trying to comfort her. His wife then came into the room.
The appellant testified that C.B. asked him why J.H. was crying. He told her he hit J.H. on the chest. C.B. pulled up J.H.'s shirt. The appellant testified that he did not see any red marks. He walked out of the bedroom and C.B. asked him where he was going. She told him to get out of the house. He walked into her art room and turned around and she punched him on the jaw. He reached over to grab her, and they both fell. He testified that his arm went around her neck accidentally. The appellant testified that he got up and went into the living room. J.H. came out and his wife came into the living room. She took continuous swings at him. She told him that if he did not get out of the house, she was going to call the police and tell them that he was trying to kill her daughter. He stated that J.H. did not understand what was going on and that she got knocked down in the scuffle. He admitted getting the tape because he wanted to control his wife. The fight ended and C.B. calmed down. She was sitting on the floor and J.H. was on the floor with her back to the couch. He stood J.H. up and took her to bed. He then laid down on the couch and fell asleep.
The appellant further testified that it was his wife's idea to give up custody of J.H. He testified that he was going to leave his wife. He further testified that she attempted suicide after her ex-husband told her that he would take J.H. and the appellant told her he was going to leave her even if her ex-husband took custody of J.H.
On rebuttal, Paula Agnew of DHR testified that she received a call from the appellant on September 6, 1989, about placing J.H. She testified that he told her he was J.H.'s father. She further testified that he *Page 555 
told her that when he placed J.H. he never wanted to see her again.
 I
The appellant first contends that the trial court erred in consolidating the separate indictments for trial without giving him the opportunity to be heard. The record reveals that the appellant was indicted on December 15, 1989, for third degree assault. Our review of the record leads us to the conclusion that the appellant was also indicted separately for attempted murder. A motion to consolidate was filed by the district attorney's office. The indictments were consolidated for trial on April 19, 1990. The record reveals that the motion was granted after a hearing, in open court, during which the appellant's attorney was present.[1] The record indicates that the appellant was reindicted on the attempted murder charge on May 21, 1990. The reindictment was a two-count indictment alleging attempted murder and child abuse. The original attempted murder indictment was eventually nol prossed. The appellant contends that he was not given an opportunity to be heard on the consolidation of the assault indictment and the reindictment. He contends that he was prejudiced by the consolidation because the evidence of assault was not the same as the evidence supporting the attempted murder and child abuse charges.
We find that the appellant did have an opportunity to be heard. The reindictment added a child abuse charge that arose out of the same incident as the attempted murder. The appellant had already been heard on his contention that the evidence supporting the assault of C.B. was different from the evidence concerning the crimes perpetrated on J.H. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Sharpe v. State,560 So.2d 1107, 1111 (Ala.Crim.App. 1989) (quoting HumaneSociety of Marshall County v. Adams, 439 So.2d 150, 152 (Ala. 1983). We find that the appellant was given the opportunity to be heard at a meaningful time and in a meaningful manner.
Even if there had not been a sufficient opportunity for the appellant to be heard, we would not find reversible error. The appellant was certainly aware of the consolidation. The cases were set for trial on June 7 and the appellant filed several motions relative to both cases in open court. The cases were then reset for June 20. He did not object to the consolidation prior to trial nor did he raise an objection to consolidation in his motion for new trial. This court has recently held that the "opportunity to be heard" is synonymous with the "opportunity to object." Sharpe at 1111.
 II
The appellant contends that the trial court erred in denying his motion to suppress communications between the appellant and C.B. because they were protected by the marital privilege. He argues that the exception to the privilege set out in §26-14-10, Code of Alabama 1975, did not apply because the child abuse case did not result from a report pursuant to Title 26, Chapter 14.
The record reveals that the appellant filed a motion to suppress any communications from the appellant to his wife "that would be considered confidential communications between spouses." (CR. 48.) A hearing was held prior to the trial, during which the trial court denied the appellant's motion. We note that during the hearing, the appellant did not specifically address or point out to the trial court which communications were allegedly privileged. The appellant only objected on this ground once during the trial. His objection came immediately after C.B. testified that during the incident the appellant had screamed, "I'm doing this for you, I'm doing this for us. She's nothing but a worthless imbecile." (R. 20.) On appeal, the appellant specifically addresses the allegedly confidential, privileged communications. Although we do not believe that the appellant's objections *Page 556 
were specific enough to call the trial court's attention to the specific communications, there was a lengthy discussion prior to the trial and during the appellant's hearing on his motion for new trial of § 26-14-10, Code of Alabama 1975, and how it applied to the circumstances of this case. Thus, we will address the merits of the appellant's argument.
We will first address the admission of evidence that does not involve the application of § 26-14-10. The appellant contends that the trial court erred in admitting certain letters written by the appellant to C.B. while he was in jail. The record reveals that these letters were admitted by agreement. The appellant cannot agree to admit evidence and then raise the admission of such evidence as error on appeal. He also contends that the trial court erred in admitting the transcript of a conversation between the appellant and his wife that was recorded when she wore an electric transmitter. The record reveals that the transcript was admitted into evidence by the appellant; thus, he cannot claim that its admission constituted error.
The appellant also argues that the acts perpetrated on J.H., which were witnessed by C.B. were also privileged, confidential communications and, thus, C.B. could not testify as to what she observed.
The confidential communication privilege between spouses applies to "knowledge acquired by one spouse's observation of an act of the other spouse in private if the circumstances indicate the actor-spouse did the act in the presence of the other spouse solely because of the confidence normally inspired by the marriage relation." Handley v. State, 515 So.2d 121,124-25 (Ala.Crim.App. 1987) (quoting C. Gamble, McElroy'sAlabama Evidence § 103.01(4) (3d ed. 1977)). The essence of this privilege, however, is to protect confidences only.Handley at 125 (citing 8 Wigmore, Evidence § 2336 (McNaughton rev. 1961)).
 " 'The privilege has for its object the security from apprehension of disclosure — a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to communications, not to acts which are in no way communications. . . .
 " 'Nevertheless, the statutes in some jurisdictions extend the privilege to knowledge of any fact acquired in the marital relation. There is at first sight some plausibility in this extension. The confidence, it may be argued, which the husband or wife desires, and the freedom from apprehension which the privilege is designed to secure, must be supposed to be equally desirable for noncommunicative conduct as for communications.
 " 'The difficulty with this argument is that it goes too far. The rationale of the privilege is clearly inapplicable to a case, for example, where the wife, unknown to the husband, observes him disposing of a dead body in the outhouse. Since the husband did not take the wife into his confidence, it would be nonsense for the tribunal to deprive itself of the wife's evidence on the ground that compulsory disclosure in in such cases would discourage marital confidence.
 " 'At the other extreme, and properly within the privilege, however, are acts which are clearly intended to be confidential communications — for example, the conduct of a husband who brings home a package of valuables and, calling his wife's attention, says "Note where I put this package" as he places it in the fourth desk drawer. He communicates to her not only the words but the act of placing the package.
 " 'The difficult cases are the in-between ones — those in which the act is done with the knowledge that the spouse is observing it but is not a mere substitute for words. . . . To formulate a precise test would perhaps be impracticable. In some cases — those in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are other indications he intends for her to acquire knowledge of his act — the act is as much a communication as his words to her describing the act would be. Such an act falls within the policy of the privilege. In other *Page 557 
cases, however — those in which the act is done solely for the sake of doing it, the indications being that the husband is indifferent to the presence of the wife — there is no communication and the marital confidence of the act is likely to be slight. In such cases, the privilege should not be allowed to deprive the court of evidence.' "
Handley at 125-26 (quoting Wigmore at § 2337, emphasis in Wigmore, footnote omitted).
We find that the acts perpetrated on J.H. were not confidential communications which fell within the marital privilege. The manner of the appellant's acts indicates that they were not intended to be privileged communications. The appellant waited until his wife went to sleep. He then attempted to smother J.H. The record indicates that he certainly did not intend for his wife to observe his acts. The appellant did not, by his acts, seek the shelter of the intimacy of the marital relationship. Likewise, we believe that the statement made by the appellant during the incident that he was trying to kill J.H. also did not come within the privilege because the policy behind the privilege would not warrant the exclusion of such evidence.
Even if the appellant's acts and the statement cited above were deemed to be privileged communications, the evidence would still be admissible under § 26-14-10, Code of Alabama 1975. Furthermore, C.B.'s testimony concerning statements made by the appellant on the day before the incident to the effect that he was thinking of a way to kill J.H. were likewise admissible under this statute.
Section 26-14-10 provides that "[t]he doctrine of privileged communication, with the exception of the attorney-client privilege, shall not be a ground for excluding any evidenceregarding a child's injuries or the cause thereof in any judicial proceeding resulting from a report pursuant to this chapter." (Emphasis supplied.) The appellant contends that this statute is not applicable because the proceedings against him were not the result of a report made pursuant to Title 26, Chapter 14.
Clearly, the purpose of Title 26, Chapter 14, is to protect children from abuse and neglect. See § 26-14-2, Code of Alabama 1975. From our reading of the statute, it appears that this case is the type of case to which § 26-14-10 was meant to apply. The record reveals that the University of South Alabama Medical Center reported the suspected abuse to DHR immediately after the incident, pursuant to § 26-14-3(a). Marie Fain, a DHR worker, investigated the incident and spoke to C.B. at the hospital. Captain Tommy Calhoun of the Mobile Police Department was present for part of the interview. DHR determined that protective services were not needed because J.H. and C.B. could safely stay at the home of Brown's parents. Fain testified that it was normal procedure to refer DHR's reports with reference to such investigations to the district attorney's office. She stated that her investigation alone did not prompt the prosecution. The DHR report was submitted to the district attorney's office prior to May 1990. The appellant was indicted for child abuse on May 21, 1990. Captain Calhoun testified that the report did not make any recommendation concerning criminal prosecution.
As we read the statute, the proceedings against the appellant did arise out of a report made pursuant to Chapter 14. Title 26, Chapter 14, does not require that DHR make any type of recommendation concerning judicial proceedings. Section 26-14-7
requires only that DHR make an investigation as to the protection of the child. As we read § 26-14-7(d), the recommendation to be made by DHR concerns the need for protective services. Section 26-14-3(a) requires certain individuals and health care providers to report suspected abuse to a "duly constituted authority." The contents of such reports are set out in § 26-14-5. "Duly constituted authorities" include, among others, the chief of police of a municipality and DHR. § 26-14-1(4), Code of Alabama 1975.
The police took C.B. and J.H. to the hospital. The hospital then reported the suspected abuse to DHR. DHR investigated the incident and submitted its report to *Page 558 
the district attorney's office prior to the appellant's indictment. Furthermore, C.B. reported the incident to the police. Permissive reporting is provided for in § 26-14-4. Thus, we find that the proceedings against the appellant were the result of reports made pursuant to Title 26, Chapter 14. If it were not for these reports, the appellant would not have been prosecuted. Because the proceedings against the appellant were the result of such reports, any evidence regarding J.H.'s injuries and the cause of those injuries was admissible. §26-14-10 Code of Alabama 1975.
 III
The appellant next contends that the trial court erred in failing to dismiss the two-count indictment against the appellant which included the attempted murder and the child abuse charges. He argues that the indictment should have been dismissed because the State presented privileged information to the grand jury. He also contends that the State presented false evidence to the grand jury, albeit in good faith, that J.H. had suffered a broken hand when she had actually suffered a broken finger.
There is no evidence in the record to support any of the allegations made in the appellant's brief. This court is bound by the record, and the record cannot be impeached by mere conclusory allegations of counsel in brief. Harris v. State,563 So.2d 9 (Ala.Crim.App. 1989); Johnson v. State,542 So.2d 341 (Ala.Crim.App. 1989); Hollins v. State, 415 So.2d 1249
(Ala.Crim.App. 1982). Furthermore, we have previously held that the allegedly privileged communications were admissible. (See part II of this opinion.) Even if the grand jury had considered illegal evidence, the fact that illegal evidence was considered by the grand jury along with legal evidence does not render the indictment void or subject to being quashed. Coralv. State, 551 So.2d 1181 (Ala.Crim.App. 1989). We also note that either a fracture of the arm or finger is sufficient to show child abuse. Thus, even if the State presented evidence that J.H. suffered a fractured arm when she had in fact suffered a broken finger, the appellant was not prejudiced thereby.
 IV
The appellant next contends that the trial court erred in denying his motions to suppress and in allowing the State to cross-examine the appellant as to inculpatory statements he made to the police without laying the proper predicate. The record reveals that the appellant's motions to suppress his statements were never ruled on by the trial court. Thus, this issue is not preserved for our review. See Donahoo v. State,552 So.2d 887 (Ala.Crim.App. 1989). Furthermore, the appellant never objected to the testimony during the trial. Matters not objected to at trial cannot be raised for the first time on appeal. Thornton v. State, 527 So.2d 148
(Ala.Crim.App. 1987), writ quashed, 527 So.2d 146 (Ala. 1988); Bell v.State, 466 So.2d 167 (Ala.Crim.App. 1985).
Even if this issue had been preserved for review, there was no error in allowing the testimony. The record reveals that the appellant testified about the statement at length during his direct examination and even asserted that the statement was not true. The State's cross-examination did no more than go over matters that were previously brought out during direct examination.
 V
The appellant next contends that there was a fatal variance between the child abuse indictment and the proof presented at trial because the State's proof indicated that the offense occurred on September 7, 1989, and the indictment alleged that the child abuse offense occurred "on or about September 18, 1989." (R. 11). Alabama law requires a material variance between the indictment and the proof adduced at trial before a conviction will be overturned. Ex parte Collins, 385 So.2d 1005
(Ala. 1980); Smith v. State, 551 So.2d 1161 (Ala.Crim.App. 1989). *Page 559 
"The phrase 'on or about' is defined as: 'A phrase used in reciting the date of an occurrence . . . to escape the necessity of being bound by the statement of an exact date, . . .; approximately; about; without substantial variance from; near.' Black's Law Dictionary 982 (rev. 5th ed. 1979)." Smith
at 1165. "When the government charges that an offense occurred 'on or about' a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment. Proof of a date reasonably near the specified date is sufficient." United States v. Reed,887 F.2d 1398, 1403 (11th Cir. 1989) cert. denied, 493 U.S. 1080,110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990). A variance between the date alleged in the indictment and the date proved at trial will not result in a reversal "as long as the date proved falls within the statute of limitations and before the return of the indictment." Id. We find that there was not a material variance between the indictment and the proof adduced at trial. See,e.g., Smith. We note that it is clear from the record that the appellant had notice of the offenses of which he was accused. A motion in limine filed by the appellant two weeks before the trial referred to the date of the offense as September 7, 1989. The trial court did not err in denying the motion to dismiss the indictment.
 VI
The appellant next contends that the evidence is not sufficient to sustain the conviction. His argument is based on the credibility of the witnesses and the weight of the evidence. The weight and probative value to be given to the evidence, the credibility of the witnesses and the resolution of conflicting testimony are for the jury's determination.White v. State, 546 So.2d 1014 (Ala.Crim.App. 1989); Currinv. State, 535 So.2d 221 (Ala.Crim.App.), cert. denied,535 So.2d 225 (Ala. 1988). "A conviction will not be set aside on the basis of insufficiency unless 'allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust.' " Ogle v.State, 548 So.2d 499, 501 (Ala.Crim.App. 1988) (quotingJohnson v. State, 378 So.2d 1164, 1169 (Ala.Crim.App.), cert.quashed, 378 So.2d 1173 (Ala. 1979)). See also Ex parteCunningham, 548 So.2d 1049 (Ala. 1989). We find that the evidence was clearly sufficient to support the appellant's conviction. Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).
For the reasons set forth above, this case is due to be, and hereby is, affirmed.
AFFIRMED.
All the Judges concur.
[1] We note that the consolidation order indicates that the appellant moved for the consolidation.