[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1016 
George William White was indicted for the capital murder of his wife Sara Charlene White. He was convicted of the lesser included offense of murder and was sentenced to life imprisonment. Review convinces this court that White did not receive a fair trial and that his conviction must be reversed.
 I
White contends that his conviction should be reversed because the circumstantial evidence upon which it is based does not exclude every other reasonable hypothesis but that of guilt. We disagree.
 "The standard for appellate review of the sufficiency of the evidence in a case such as this one was aptly set out in Dolvin v. State, 391 So.2d 133 (Ala. 1980):
 " ' "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130
(5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).
 " ' "[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
 " ' " 'Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. . . . The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136.' " ' (Emphasis in original.)
 "391 So.2d at 137-38, quoting Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App. 1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala. 1979)." Robinette v. State, 531 So.2d 697, 698-99 (Ala. 1988).[1] *Page 1017 
"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution." Faircloth v. State,471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, Ex parteFaircloth, 485 So.2d 493 (Ala. 1985).
"This Court must revise and overturn the verdicts of juries 'where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach the conclusion that the finding and judgment are wrong.' Hunter v. State, 34 Ala. App. 565, 567, 41 So.2d 637
(1949)." Granger v. State, 473 So.2d 1137, 1139 (Ala.Cr.App. 1985).
 " 'The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches 'a clear conclusion that the finding and judgment are wrong.' Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). 'The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.' Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821
(1969). Even though an appellate court should 'marvel that a jury would convict upon such flimsy proof,' it is 'not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt.' Toles v. State, 170 Ala. 99, 100, 54 So. 511 (1911). A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345
(1909). '[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.' Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960)." Granger, 473 So.2d at 1139.
Where a defendant's conviction is based solely on circumstantial evidence, "if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed." Ex parteBrown, 499 So.2d 787, 788 (Ala. 1986) (emphasis in original). "Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty." White v.State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied,423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). "Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused." Cochran v. State,500 So.2d 1161, 1177 (Ala.Cr.App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran,500 So.2d 1179 (Ala. 1985). "It is not necessary for a conviction that the defendant be proved guilty to the 'exclusion of every possibility of innocence.' " Burks v. State, 117 Ala. 148,23 So. 530 (1898). "The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant."Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895).
 "[T]here was some evidence from which inferences might have been drawn by the jury unfavorable to the innocence of the *Page 1018 
accused. We regard this evidence as weak, inconclusive, and unsatisfactory, and we marvel that a jury would convict upon such flimsy proof. But we are not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt." Toles v. State, 170 Ala. 99, 54 So. 511 (1911).
Here, the State's case against White is based on weak circumstantial evidence. Both parties to this appeal have relied on essentially the same factual circumstances in arguing White's guilt and innocence. Each particular circumstance is almost insignificant when isolated and viewed separately. It is only when the individual threads of fact and inference are woven together that the garment of guilt is seen to fit this defendant.
In February of 1985, White was the vice-president of Townsend Building Supply (hereinafter referred to as the warehouse) in Enterprise, Alabama. The State's evidence established that, sometime after 5:00 on the evening of February 27, 1985, White and his wife were preparing to go out to dinner. Mrs. White's mother, Bess Porter, had arrived to pick up the Whites' children. She testified that White dialed a number on the telephone and "then hung it up immediately, and before he could stand up the telephone rang and he answered it." After the telephone call, White told his wife that a man needed a part and that they would go by the warehouse on their way out to dinner. Mrs. Porter asked White who he called. She testified that White "said he had called his mother to tell her that they were going out and then he realized he had already told her that they were going out." Mrs. Porter also testified that, to her knowledge, White had never returned to the warehouse after hours to let someone have a part and that he "would always tell them that they would have to call either Oscar Lawhorn or Dale Townsend because he could not go out and let them have a part."
At trial, an employee of General Telephone Company testified and demonstrated how a telephone could be made to ring by dialing the number assigned to that particular telephone and immediately hanging up.
White's neighbor saw White and his wife leave White's house at 5:20.
Shortly before 6:00 that night, White telephoned the Enterprise Police Department from the warehouse to report that both he and his wife had been robbed and shot. At the scene, White told the police that he and his wife had been robbed and shot by an intruder armed with a pistol, wearing gloves and two toboggans. Two toboggans were found outside the store. Tracking dogs were unable to pick up a scent in the area where the toboggans were discovered.
Forensic analysis revealed that some fibers found on both toboggans were consistent with fibers in the carpet of the company vehicle assigned to White. Some fibers on the toboggans were consistent with the fibers of other toboggans sold at the warehouse. An animal hair found on one toboggan was "similar in color" to a hair from one of White's dogs. Human hair found on the toboggans did not come from White.
Mrs. White had been shot twice in the head. She had also sustained a blunt force injury to the back of her head. She was breathing but unconscious when the police and rescue squad arrived but was "essentially dead on arrival" at the hospital emergency room. The official cause of death was "blunt force injury and gunshot wounds to the head." There was expert testimony that the blunt force injury could have been caused by the pistol subsequently found in the warehouse, although it was also consistent with any number of other things. One gunshot wound was a "close range gunshot wound" meaning that "[t]he weapon was pressed up against her hair and her head." One bullet had fragmented after hitting Mrs. White and "was just sort of embedded there on the skull without ever penetrating." The fragments could not be identified. Another expert testified that this wound to Mrs. White could have been made by a bullet fragment. The whole bullet removed from Mrs. White's head was identified as a .32 caliber bullet *Page 1019 
which had been fired through the pistol subsequently found at the warehouse.
White had sustained three gunshot "tangential or superficial" wounds in the right thigh, upper arm, and abdomen. The physician who examined White could not state that White's wounds were self-inflicted. He found no physical evidence of any struggle. Clippings of White's fingernails were taken while he was in the emergency room the night of the homicide. Scientific analysis failed to reveal the presence of gunshot primer residue.
There were two bullet entrance holes in the front of the shirt White was wearing. One hole "was made while the muzzle of this revolver was in contact with this cloth." "[T]he hole in the left sleeve was made while this muzzle was approximately one inch away when it was fired." On the pants, the entrance hole was in the front and the expert "could only determine that the revolver was on close proximity, within thirty inches from discharge."
Although the premises of the warehouse were searched on February 27, 1985, the date of the homicide, the murder weapon was not discovered until July 8, 1985, when a warehouse employee inadvertently discovered a .32 caliber pistol behind some boxes of electrical wiring inside the warehouse. This pistol was dirty and dusty.
Oscar Lawhorn was the manager of Townsend Building Supply. He identified the pistol as being the one he kept in the nightstand beside his bed at his residence. Three or four days after the homicide he had discovered that his pistol was missing. Lawhorn testified that on two or three occasions he had made the statement in White's presence that he kept the pistol "on the nightstand at the house." Lawhorn also testified that on the morning of the date of the homicide White had borrowed his company pickup truck "to get a vacuum cleaner at [White's] house that [White] had borrowed from the warehouse." White had had the vacuum cleaner for "probably a month" and no one was looking for it that particular day. The key to Lawhorn's house was on the same keyring he gave to White with the key to the truck.
The State proved that White received a total of $30,575.44 in benefits from two life insurance policies on his wife.
About 5:30 on the afternoon of the murder, Shirley Bowden picked up a light fixture which Oscar Lawhorn had left for her behind a bush in front of the warehouse because the store had closed for the day. At this time, White and his wife were inside the warehouse.
Kay Tidwell, a former employee at the warehouse, testified that she had had an intimate affair with White before Mrs. White's death and that White had mentioned divorcing his wife. Ms. Tidwell stated that White had not mentioned marrying her.
Investigator Steve Weekley of the Alabama Bureau of Investigation interviewed White on March 7, 1985. He testified that White gave him a detailed account of the events. The substance of this account was that White and his wife went to the warehouse on their way to supper to let a Mr. Lolley have a part. At the warehouse, a man wearing two ski masks and armed with a pistol forced White to open the vault. White gave the man $1800. The man shot Mrs. White when she stumbled coming out of the vault and then shot White after White jumped on the man and began struggling. White admitted that he was having an affair with Ms. Tidwell and that he was planning on divorcing his wife "who had become like a child."
Investigator Weekley testified that White told him that his wife was shot twice in the back of the head and that the gun was not touching his wife. Weekley also stated that White acknowledged that he knew that Lawhorn owned a pistol. Weekley testified that White told him "three different versions" of certain details and that he gave more than one account of what happened.
White contends that the evidence does not support his conviction because the incriminating facts are subject to alternative interpretations. In his brief on appeal, White lists circumstances relied on by the *Page 1020 
prosecution and offers an "adequate explanation for each": (1) Although the State sought to convey the implication that White struck his wife and then shot her, the blunt force injury to the back of Mrs. White's head could have been caused by any number of instruments other than the pistol and even could have been caused by an object in the ambulance.
(2) Because White's wounds were superficial, the implication can be drawn that they were also self-inflicted. However, there was testimony that the wound to the abdomen could have been very serious, and perhaps fatal had the bullet continued on the course of the entry wound. The "most compelling" evidence of White's alleged innocence is the fact that scientific analysis of clippings of White's fingernails taken in the emergency room after the shooting failed to reveal the presence of primer residue, affording an inference that White did not fire any firearm.
(3) The prosecutor's interpretation of the testimony is that White knew that Lawhorn kept a pistol in his bedstand, that White borrowed his truck and took that opportunity to obtain the pistol — the murder weapon — from Lawhorn's residence. However, the evidence shows that a number of other people had, or could have had, access to Lawhorn's house, that Lawhorn had not seen the pistol for "probably a couple of weeks before" the murder, and that the residence was frequently left unlocked. No fingerprints were found on the pistol when it was recovered five months after the murder.
(4) At trial, Investigator Weekley testified that he videotaped White's four-hour interrogation which was conducted on the same date as the murder shortly after White was released from the emergency room. Weekley stated that White acknowledged that he knew that Lawhorn had a pistol and that this acknowledgment was contained on the video tape. Only after the trial did Weekley discover that the acknowledgment was not on the video tape but that it had been obtained in a separate non-recorded statement White gave Investigator Weekley following the videotaped interview. White argues that this shows that Weekley's testimony was "a complete and total fabrication." Appellant's brief at 23.
(5) Through "trace" and fiber evidence, the prosecution attempted to show that fibers from White's car were consistent with fibers on the toboggans found near the scene of the shootings, that other fibers on the toboggans were similar to toboggans sold at the warehouse, and that a single orange colored animal hair found on one toboggan was "similar in color" to hairs taken from White's dog. Yet, there was also testimony that the fibers from White's car were "commonly found in the makeup of carpet," and could have come from another source or location. Most of the fibers taken from the toboggans could not be matched. The animal hair could have come from a bloodhound present at the scene after the shooting. A Caucasian head hair discovered on one of the toboggans could not have come from White.
(6) Although the indictment charged that White killed his wife for the insurance, the evidence was that the proceeds of both policies were relatively small and that both policies had been taken out several years before the murder. In this regard, before trial, the State had sought to reduce the capital charge to murder but White would not agree to any amendment of the indictment. Although the State sought to imply that White's extramarital affair with Ms. Tidwell was the motive for the murder, at trial, Ms. Tidwell testified that White never mentioned marriage to her. "The presence of a motive for the commission of the offense charged, while always a legitimate subject of inquiry, is not indispensable to a conviction, or an element of the burden of proof which the law devolves upon the prosecution, whether the agency or connection of the accused is manifested by direct and positive evidence, or only by circumstantial evidence." Brunson v. State, 124 Ala. 97,27 So. 410, 411 (1900).
White also argues that there are a number of other circumstances which support his innocence. (1) White's response to the *Page 1021 
police-instigated telephone call that if the caller had evidence incriminating White she should contact the police was inconsistent with his guilt.[2] (2) The imprint of a tennis shoe was found outside the door White said the gunman used after the shooting. White had on shoes with smooth soles.
In contradiction of these facts are a number of circumstances tending to incriminate the defendant. There was no blood in the office or on the telephone used by the defendant to call the police. The defendant was only wounded, although it appears that his wife had been executed. The mysterious individual who allegedly needed a part from the warehouse was never identified other than "Mr. Lolley." The defendant gave several different accounts of some of his actions.
The number of indications of a consciousness of guilt "is impossible to limit, nor can their nature or character be defined." McAdory v. State, 62 Ala. 154, 159 (1878). "The jury may properly consider conflicting statements as indicating a consciousness of guilt." Cumbo, 368 So.2d at 876; Hayes v.State, 395 So.2d 127, 147 (Ala.Cr.App. 1980), cert. denied, Exparte Hayes, 395 So.2d 150 (Ala. 1981). In weighing the evidence, "courts and juries must use common sense, common reason, and common observation as well as a common knowledge of the usual acts of men and women under given circumstances."Thompson v. State, 21 Ala. App. 498, 499, 109 So. 557 (1926).
From the evidence presented at trial, the jury might reasonably have found that the evidence excluded every reasonable hypothesis except that of guilt. "Facts apparently trivial and innocent in themselves, sometimes derive importance from their connection and combination with other facts."Lawson v. State, 20 Ala. 65, 79 (1852). "Circumstances may be minute, and, considered separately, of very little importance, shedding but a dim ray of light upon the transaction sought to be elucidated; yet, when grouped together and considered in the aggregate, they may constitute a chain of evidence which draws the mind to a very satisfactory conclusion." Campbell v. State,23 Ala. 44, 69 (1853).
 "Another element affecting the credibility of evidence is found in the frequent occurrence of undesigned coincidences, which, though sometimes startling and unexpected, are unaccountable except upon the hypothesis that the narrative, of which they form a part, is true. No event stands alone. It is the result of others which precede it. It may in its turn be the fruitful cause of many others which follow or relate to it. So every fact or circumstance is connected with others of a collateral nature, rendering it well nigh impossible for any one to concoct a narrative which, upon comparison with other and related circumstances will stand the test." John Niblack, Underhill's Criminal Evidence, 5 at 6 (4th ed. 1935).
"The state [is] not required to remove by proof the possibility that defendant was innocent, but only to establish his guilt beyond a reasonable doubt." Rice v. State, 204 Ala. 104, 106,85 So. 437 (1920); Payne v. State, 424 So.2d 722, 725
(Ala.Cr.App. 1982). "[I]f there was a probability of defendant's innocence, the defendant should be found not guilty. A probability of defendant's innocence is the equivalent of a reasonable doubt of guilt, which requires his acquittal. * * * The law does not require full proof of guilt, — another expression for clear or positive proof, beyond any doubt, — but only such proof as produces satisfaction beyond reasonable doubt." Bones v. State, 117 Ala. 138, 23 So. 138,139 (1898). "A defendant's guilt need not be proved 'clearly, fully, and conclusively,' and, [instructions] thus framed, . . . exact too high a degree of proof." McClain v. State, 182 Ala. 67,62 So. 241, 245 (1913). "In criminal prosecutions, circumstantial evidence should be such as to exclude a rational probability of innocence to justify *Page 1022 
conviction." Chisolm v. State, 45 Ala. 66, 70 (1871). The evidence need not exclude hypotheses "rendered exceedingly remote and improbable, and morally, though not absolutely, impossible. . . ." Id. "[T]he true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be 'such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.' " Mitchell v. State, 114 Ala. 1, 22 So. 71, 72
(1897). "The law does not require the exclusion of every hypothesis of innocence, but only every reasonable hypothesis."Walker v. State, 134 Ala. 86, 32 So. 703, 704 (1902). "It is not the law, that the evidence must exclude every other hypothesis than that of defendant's guilt, or than the existence of the facts essential to conviction. The rule goes no further than to the exclusion of other reasonable — not speculative, imaginary, possible, hypotheses." Little v. State,89 Ala. 99, 103, 8 So. 82, 83 (1890). "It is not any doubt arising out of the evidence which authorizes a jury to acquit one on trial for [a] crime, but only a reasonable doubt of such guilt generated by the evidence in the cause, — not a possible, speculative, or imaginary doubt." Perry v. State,87 Ala. 30, 6 So. 425, 427 (1889).
 "Human testimony is rarely so clear and full, as to exclude conjectured, divergent possibilities. Neither does mathematical certainty, or physical impossibility, define the rule. Conviction, resting on human testimony, can never attain the certainty of mathematical demonstration, or repel all possible doubt of its correctness. A rule so exacting would paralyze the punitive arm of the law. 'A doubt which requires an acquittal, must be actual and substantial, not mere possibility or speculation. It is not a mere possible doubt, because every thing relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt.' " Coleman v. State, 59 Ala. 52, 54 (1877).
See also Mose v. State, 36 Ala. 211, 231 (1860). "The jury need never find that the defendant cannot be innocent. . . . There might be a possibility of defendant's innocence, and yet from the whole evidence, no reasonable doubt of his guilt." Morrisv. State, 124 Ala. 44, 27 So. 336, 337 (1900).
A mere conflict in the evidence does not authorize an acquittal. Monk v. State, 258 Ala. 603, 605, 64 So.2d 588
(1953). A conviction is warranted though the evidence is susceptible of being interpreted that another committed the crime, where such interpretation is not of sufficient force to raise a reasonable doubt of accused's guilt. Brown v. State,121 Ala. 9, 25 So. 744, 745 (1899).
"The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone." Willcutt v. State, 284 Ala. 547, 549,226 So.2d 328 (1969). "When a case is tried by a jury, it would be usurpation of authority on the part of the trial judge to take it upon himself to determine whether the evidence on a particular issue in favor of one party was evenly balanced with, or weighed more or less than, the evidence favorable to the other party." Wilhite v. State, 485 So.2d 777, 781
(Ala.Cr.App. 1985), affirmed, Ex parte Wilhite, 485 So.2d 787
(Ala. 1986). "The rule is well settled in this jurisdiction that circumstantial evidence may afford satisfactory proof of the corpus delicti and if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury. . . ." Johnson v.State, 247 Ala. 271, 275, 24 So.2d 17 (1945).
"The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence islegally sufficient to allow submission of an issue for decision to the jury." Bankston v. State, 358 So.2d 1040, 1042 (Ala. 1978) (emphasis in original). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing *Page 1023 
all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust."Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969). Where the evidence, taken as a whole, "fairly and reasonably permits of inferences favorable to the guilt of the defendant," an appellate court "cannot usurp . . . functions [of the jury] by here passing upon the mere weight of the evidence they had before them." Pope v. State, 174 Ala. 63, 57 So. 245, 248
(1911). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State,269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fullerv. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).
While the evidence against White is weak, here, as inBridges, 284 Ala. at 420, 225 So.2d 821, "[w]e cannot say that the verdict in this case is so patently against the weight of the evidence as to convince us that it was wrong and unjust."
We have examined the issue of the sufficiency of the evidence in this case at some length in order to show that the evidence was legally but just minimally sufficient to support White's conviction. However, the paucity of the evidence has been a significant factor in our determination of Issue II of this opinion.
 II
White contends that the trial judge abrogated his judicial responsibility in determining the admissibility of a videotaped interview of White by the police and that his comments and conduct in connection with the video tape constituted error prejudicial to the defendant. We agree.
In determining whether or not the trial court committed reversible error, we have examined the entire record.Savage v. State, 380 So.2d 375, 380 (Ala.Cr.App. 1980).
The first mention of the video tape in the record occurred when, outside of the jury's presence, the district attorney informed the court that he intended to offer "the original video tape interview or interrogation of this defendant" and also "an edited version of it wherein certain portions are deleted which deals with polygraph exams, truth serums, or hypnosis." The district attorney informed the trial judge that the edited tape was offered because "the State is well aware that any reference to polygraph, hypnosis or truth serum in that tape is inadmissible."
As far as this Court can determine from the record, the existence of the video tape was first mentioned to the jury by the trial judge when he instructed the jury on the reason for a delay in the taking of testimony and the reason why the jury had to be sequestered over the weekend. The trial judge stated:
 "But now, then, we're through with all of the witnesses but two. The nature of one of those witnesses requires what is called an in camera hearing. And the law requires that when that kind of evidence is offered that the Court must hear it outside your presence and rule on its admissibility or its inadmissibility. After the Court rules on it, if it's inadmissible that's the end of it. You don't ever have to know about it or hear it. If the Court rules it admissible then you ladies and gentlemen get to hear it, we all have to hear it again. Now, just so that you'll understand it, that testimony because it involves videos is not ready at this point. It won't be ready even if they work — with the people working all day today, all day Saturday and all day Sunday, it won't be ready for viewing by the Court until Monday. It's going to take at a minimum of six hours for the Court to view it. At that point it still, assuming that it would be admissible, it still can't go to you. It would have to — depending on what happens it could conceivably have to go back and other work be done upon it and it would have to come back and the Court would have to hear it again. My point being that — of this in camera — by the conferences with the State and what we've determined has to be done, the Court has at this point *Page 1024 
probably eighteen hours of in camera evidence, not necessarily that the Court is sitting there hearing it, but eighteen total hours as best we guesstimate from the time that it is offered to the time the Court views it to whatever the rulings are until it can be brought back and proffered in if there's anything wrong with it or whether there's not anything wrong with it. My point being that you're talking of actual working time for the witness and the Court and the State and the defendant, a total of eighteen hours. If we work nine hours a day Monday and nine hours a day Tuesday we may can have it ready for you Wednesday morning. That's bottom line. Conceivably it wouldn't be ready until Wednesday noon. Then after that you have to hear it and it would be conceivably four hours for you to hear it. My point being that then at that point the State would have one other witness and we would rest, when I say we the State, rather, would rest, and then the defendant would be entitled to move forward. It may well be, the prognosis at this point goes up to Labor Day. We've never had a criminal trial in Coffee County that goes two weeks with the jury sequestered. And I don't know anything else to do — I mean — everyone is caught within their province operating under the law, including you folks. And your duty is tremendous and the burden is very difficult for you. I admire you and I salute you for your patience. That doesn't make it any easier for you. I'm just trying to tell you what we all, everyone, the State, the defense, the Court, and the jury is up against. Everyone, all of us, are willing to work Saturday and Sunday to get it to you. And the work is actually going on now, getting it ready, but it won't be actually ready with what the Court has to do to it until maybe Sunday night or Monday morning. And then I still — when I say I — the Court is charged with the responsibility when it's offered by the State that you have to sit down and you have to go through it and you have to view it and you have to rule, and then, then depending on what happens then, then that's the part of it that I can't go into with you." (Emphasis added.)
There was no objection to these remarks.
A hearing was then held outside the presence of the jury to determine the admissibility of the videotaped interview of White by the police. A written transcript was employed at this hearing to determine which portions of the tape should be deleted. The portions of the video which contained references to "polygraph hypnosis or truth serum" were again recognized by the district attorney as inadmissible. Throughout the hearing, the trial judge repeatedly and on numerous instances made it clear that, on almost every occasion, he would admit those portions of the tape which the prosecutor wanted admitted and would reject those portions the prosecutor wanted deleted. The following comments are representative of the judge's remarks throughout the hearing:
 "THE COURT: If you [district attorney] tell me you don't think it's improper I will let it in, if you want it in. I will let you call this one. If the State wants it in I'll let them have it.
"THE COURT: . . . Do you want it?
"MR. FOLMAR [District Attorney]: Yes, sir.
 "THE COURT: Overruled [defense counsel's objection]. I think it's error."
* * * * * *
 "THE COURT: What I am trying to do is give the State as much latitude as I can. If there is a question here that I think is inadmissible, if you all absolutely insist on it I will do my best to let it in. I don't know how I can be much fairer than that. . . . And I am going to give you as much latitude, to both sides, as I can. I don't know how I can be any fairer."
* * * * * *
"THE COURT: They insist on it. I overrule.
 "THE COURT: I'll let you call it, if you all want it."
* * * * * * *Page 1025 
 "THE COURT: Sustain objection to that question because the State — even the State says they don't insist on it."
* * * * * *
 "THE COURT: I assume what we're doing, we're going through this and I wait a minute for a response from the State. If there is any of this that you insist on, tell me. I'm expecting now we can more or less go through and take it out by agreement.
 "MR. LINDSEY [Defense Counsel]: No, sir. We don't agree to anything, if the Court please.
 "THE COURT: I know, but my point being, the State is not saying they don't insist, so, I am assuming they don't oppose the objection."
* * * * * *
 "THE COURT: We have sort of settled into a pattern unless the State insists on something. It's just simpler to handle it that way."
* * * * * *
 "THE COURT: It won't matter. We have got so much error in it anyway." (Emphasis added.)
At the close of the hearing, which lasted approximately two days, the State withdrew its offer of the video tape, after which the trial judge responded:
 "THE COURT: But you understand that the Court is saying that it's willing to let the video tape in in its entirety if the State insists?"
* * * * * *
 "THE COURT: Gentlemen, I was just going to say, I understand where we are and I know everyone is anxious to move on. I guess I just wanted to make it clear that I — not only to the State and to the defendant, but for the purposes of this record, I guess I just want to make it absolutely clear that the Court would admit the video if it was offered. And that regardless of anything heretofore. But if the State is moving to withdraw it, then there is nothing for the Court to rule on."
These comments were not made in the presence of the jury. Despite the court's offer, the prosecution "stood by" its motion to withdraw the video tape.
The trial resumed and, in the jury's presence, Steve Weekley, an agent for the Alabama Bureau of Investigation, testified to the substance of his interview with the defendant. Defense counsel cross-examined Weekley about the video tape in an effort to impeach his testimony, even though on direct examination the video tape itself had not been mentioned. On redirect examination, the prosecutor offered the transcript of the video tape, stating that defense counsel "has cross-examined this witness from it. He has read out of it. He has made reference to it in front of this jury." After some argument by both parties, the State once again (the second time) withdrew its offer. Then, the following occurred in the presence and hearing of the jury:
 "THE COURT: You gentlemen [the prosecutors] have got the same privilege to ask questions — you know — from the transcript just like Mr. Lindsey [defense counsel] has. But I want to make it clear that you have — here again, you have made it clear that it may or does contain evidence that the State considers inadmissible —
 "MR. CARMICHAEL [Assistant District Attorney]: Judge, we withdraw the offer.
 "THE COURT: — but I want you to understand that the Court is willing to let this in if you gentlemen want it in. If the State wants this transcript in, on their motion the Court will grant that motion.
 "MR. FOLMAR [District Attorney]: The State offers it, Judge.
 "THE COURT: Okay. So that we understand each other, this is exactly where we were yesterday. This is exactly what we have taken two-and-a-half days to get to this point. And you gentlemen have done it again. You have said on the record that this transcript of that video tape either does or may contain inadmissible evidence. And you gentlemen know that if it comes in *Page 1026 and it's inadmissible that anything we do here probably will — we all know may be reversed on any appeal of this case. Now, in the face of that, you gentlemen offer it? And I'm telling you, if you do, if the State insists on it, the Court is going to let it in because I want to let you gentlemen run your lawsuit. But I want that record to accurately reflect that this Court is not under any circumstances going to interfere with the State's case. And if the State insists on evidence that they have deemed is inadmissible the Court will let it in.
"MR. LINDSEY: May I say this into the record?
"THE COURT: Yes, sir.
 "MR. LINDSEY: And if His Honor please, I mean no disrespect by what I say.
 "THE COURT: At this point I think that you ought to be able to say anything to the Court, that they ought to be able to say anything to the Court, that anybody wants to say. Because we've gone so far beyond the realm of what we all know, gentlemen, is proper, it could absolutely put us all before the Bar. Everybody here who is legally trained knows it. Ladies and gentlemen, I think what we should do at this point is we ought to take a recess and you ladies and gentlemen — let me ask the Bailiff to remove the jury and we're going to take a short recess. I don't want anybody to approach me. I don't want anybody to talk to me about anything. I want you to decide what you're going to do and we'll take a ten minute recess. If it's going to be like gutting hogs with a rusty nail, so be it. Thank you very much.
"(Thereupon a ten minute
(recess was taken, after which
(the following occurred in the
(presence and hearing of the
(jury:
"MR. LINDSEY: May I proceed, if His Honor please?
"THE COURT: Yes, sir.
 "MR. LINDSEY: I was about to say to His Honor that immediately prior to the recess and while the jury was in the box, and while I hope the Court understands that we mean absolutely no disrespect, but it is becoming increasingly hard for us to defend this defendant against the whims of the prosecution and the statement made by the Court that if they wanted this thing that he would allow it, in spite of the fact that they have been wallowing with this thing since last Thursday or Friday in an effort to get it in some sort of posture where it won't smell so bad. And to to [sic] something with it. And they've been doing it, we haven't been doing it. And His Honor knows that. And the statement by the Court to the effect that what the result would be on an appeal or the appellate process having been resorted to in his remark before the jury compels us to move His Honor for a mistrial in this case.
"THE COURT: I assume you gentlemen oppose that?
 "MR. FOLMAR: May it please the Court, we proffered before the jury recessed, we offered the transcript into evidence. At this time we would ask the Court that that offer be withdrawn. We do not offer the transcript.
 "THE COURT: So, the State does not offer the transcript?
"MR. CARMICHAEL: That's correct.
 "THE COURT: Now, gentlemen, let's try to do it this way. Now, ladies and gentlemen of the jury — and I'm aware that this motion is before me. I want to say to you ladies and gentlemen of the jury that what you're seeing and what you're hearing is unusual because of the posture that — that this case is in at the moment. You ladies and gentlemen disregard and put out of your minds the remarks made immediately before the recess by counsel. They have no place in the trial. What does have bearing is the evidence that comes from the witness stand. Now, the State is withdrawing their offer of the transcript. It never did come into evidence. But, they are not even offering it into evidence. They are withdrawing it. The defendant is moving *Page 1027 
for a mistrial based on the proceedings that happened. The Court is going to deny that motion for a mistrial. We've come too far, in the Court's opinion, to quit at this point. Because there are — so, I am going to leave it at that and tell you ladies and gentlemen to disregard the remarks made before the recess by the Court and by counsel. It all came before you and it was all done, and I am asking you to exclude it from your minds when you deliberate on this case. Okay." (Emphasis added.)
The cross-examination of Investigator Weekley continued and, again, he was specifically questioned by defense counsel about the video tape. Defense counsel even showed the video tape cassette to the witness in the jury's presence and apparently used a transcript of the tape in questioning Weekley.
At the end of the trial, in his final instructions to the jury, the trial judge cautioned:
 "You, ladies and gentlemen are the sole weight that should be given all of the testimony in the case. My duty is to define the law. Your duty is to determine the facts. I want you to understand that I do not have any opinion as to the facts of this case and I do not want you to think from anything that has been said here in this charge or in any ruling that I have made in determining the law in this case that the Judge thinks one way or another about the facts of this case. Because that is not my purpose and not my province. You take the testimony of the witnesses together with all of the competent and legal inferences therefrom and you apply your common sense and in an impartial and honest way you determine what you believe to be the truth."
The judge's conduct and comments in dealing with the admissibility of the video tape are serious matters over which this Court has diligently and conscientiously labored. We conclude that under the circumstances of this case the actions and comments of the trial judge denied the defendant a fair trial.
 A.
It does appear, and we are convinced, that the trial judge abdicated his responsibility in determining the admissibility of the video tape. Initially, it was the duty of the trial judge to determine the admissibility of the video tape of the defendant's interrogation by the police before submitting it to the jury. Ex parte Shula, 465 So.2d 452, 454 (Ala. 1985);Wright v. State, 340 So.2d 74, 76 (Ala. 1976).
By statute, a circuit court has "exclusive original jurisdiction of all felony prosecutions." Alabama Code (1975), § 12-11-30(2). "It is the duty of the trial court to make certain that a defendant can, and will, obtain a fair and impartial trial by an unbiased and unprejudiced jury."Nickerson v. State, 283 Ala. 387, 390, 217 So.2d 536 (1969). The court supervises all trial proceedings so that the rights of neither party shall be prejudiced. Arnett v. State, 225 Ala. 8,9, 141 So. 699 (1932). "The trial judge is not present to aid either party in the lawsuit and certainly under no duty to do so. He is the arbiter and moderator, not an advocate. "Tharp v. Union State Bank, 364 So.2d 335, 337 (Ala.Civ.App. 1978). A trial judge has a duty to maintain proper order and decorum in the courtroom. Lockett v. State, 50 Ala. App. 58,61-62, 276 So.2d 643 (1973). "It is expected of the trial judge, in the exercise of perfect impartiality, to see that the law is properly administered and justice done both in respect to the State and the accused." Cook v. State, 36 Ala. App. 449,452, 57 So.2d 832 (1952).
It is a fundamental concept under our State and federal constitutions that any person charged with a criminal offense is entitled a fair and impartial trial in accordance with and governed by the applicable laws of evidence and procedure.Patterson v. State, 21 Ala. App. 22, 104 So. 866 (1925). Trial judges have a duty to follow the law and "judges must conform their opinions expressed in the discharge of their official duty to the opinions of the Supreme Court, whose decisions are 'the last word' as to the law in this state . . ." Owens v. *Page 1028 State, 19 Ala. App. 621, 622, 99 So. 774 (1924). A judge has a duty to make correct rulings. "When a trial judge has made an erroneous ruling during the progress of a trial, he not only may, but it is his duty to, correct it, and to state the correction to the jury in plain terms, that the jury may be properly guided." Snoddy v. State, 20 Ala. App. 168, 174,101 So. 303 (1924). "A judge . . . should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2, Alabama Canons of Judicial Ethics.
While it certainly appears from the record that the trial judge did abdicate his judicial responsibility in determining the admissibility of the video tape — because he was willing to admit evidence which he considered inadmissible — the fact remains that the video tape was never admitted into evidence. The mere fact that a judge's conduct is inappropriate is not necessarily a sufficient ground for reversal. Stewart v.Stewart, 354 So.2d 816, 820 (Ala.Civ.App. 1977), cert. denied, Ex parte Stewart, 354 So.2d 822 (Ala. 1978). An erroneous statement of law by the trial judge made out of the presence of the jury constitutes error without injury. Knowlesv. State, 44 Ala. App. 163, 167, 204 So.2d 506 (1967). However, this abdication of responsibility was brought to the jury's attention by the trial judge.
 B.
The trial judge first informed the jury that the State wanted to offer into evidence a video tape which may or may not be admissible. Then, in the presence of the jury, he stated that the video tape either may or does contain inadmissible evidence; that its admission could cause a reversal of this case on appeal; that, despite this the court was willing to admit the video tape if the State wanted it; and that, in connection with the video tape, "We've gone so far beyond the realm of what we all know . . . is proper . . . it could absolutely put us all before the Bar."
In reviewing the alleged impropriety of the comments of a trial judge, we are guided by certain general principles:
 "In reviewing this case, we are limited to the facts reflected in the record and the fair and reasonable inferences which they afford. Munson, [v. State] 250 Ala. [94] at 97, 33 So.2d 463 [(1948)]; Williams v. State, 34 Ala. App. 253, 259, 39 So.2d 29 (1948). As this Court held in McCovery v. State, 365 So.2d 358, 362-63
(Ala.Cr.App. 1978):
 " 'Remarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial. It is not every erroneous expression of opinion by a trial judge, during trial, that will furnish a ground for reversal. To do so it must, in some manner, influence the result of the cause, or be supposed to do so. Each case rests upon its own peculiar facts and circumstances.' (citations omitted)
 "There is no ironclad rule by which the prejudicial character of the improper conduct and comments of a trial judge can be ascertained in all cases, most depending on the issues, parties, and the general circumstances of each particular case." Oglen v. State, 440 So.2d 1172, 1175-76
(Ala.Cr.App.), cert. denied, Ex parte Oglen, 440 So.2d 1177 (Ala. 1983).
We disapprove of the judge's comment informing the jury of the existence of video tape evidence before having determined that such evidence was admissible. "There is no rule of law, which requires that inquiries as to the admissibility of evidence should be conducted apart from the jury." Mose v.State, 36 Ala. 211, 229 (1860). "[T]he Constitution does not require a per se rule compelling state criminal courts to conduct a hearing out of the jury's presence whenever a defendant contends that a witness's identification of him was arrived at improperly." Holifield v. Davis, 662 F.2d 710, 711
(11th Cir. 1981), cert. denied, 455 U.S. 1026, 102 S.Ct. 1730,72 L.Ed.2d 147 (1982). However, such is the "better practice,"Wright v. State, 294 Ala. 99, 312 So.2d 421 (1975), and may even be "required" if requested in certain situations. *Page 1029 James v. State, 500 So.2d 474, 477 (Ala.Cr.App. 1986) (confession).
"[T]he reason for the rule requiring a voir dire hearing is so that the jury will not be prejudiced by hearing evidence that is subsequently ruled inadmissible." Jones v. State,407 So.2d 870, 873 (Ala.Cr.App. 1981), noting that "[g]enerally, it is reversible error to deny a defendant a hearing, outside the presence of the jury, on his motion to suppress evidence."Jones, 407 So.2d at 873, relying on Davis v. State,368 So.2d 880, 881-82 (Ala.Cr.App.), cert. denied, 368 So.2d 882 (Ala. 1979). See also Ex parte Singleton, 465 So.2d 443, 446 (Ala. 1985) ("It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible."). See also 75 Am.Jur.2d Trial 93 at 195-96 (1966) ("Remarks by a trial judge in a civil case, disclosing to the jury motions or other proceedings which have been dealt with in the judge's chambers, or otherwise out of the hearing of the jury, and were not meant to come to the knowledge of the jurors, have usually been regarded as improper, since obviously the reason for making the motion 'in chambers' is precisely to withhold the matter from the knowledge of the jury."); Jones v. State, 392 So.2d 1270,1271 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1273 (Ala. 1981) (Though not reversible error, the trial judge should not have informed jury that he had accepted only some of the instructions requested by defense counsel.).
Here, there was no objection to this particular remark of the trial judge and this particular issue has not been argued on appeal. Therefore, nothing has been preserved for review in this regard and the objection to this particular comment is considered waived. Biddie v. State, 516 So.2d 846 (Ala. 1987). We cannot treat the remaining remarks of the trial judge so leniently.
 C.
It is quite obvious to this Court that the remaining remarks of the trial judge were, in the context of this case, highly improper. The State has not argued otherwise.
Here, the trial judge informed the jury that the transcript of the video tape contained inadmissible evidence; that despite that fact, the trial judge would admit it into evidence if the State wanted it admitted; that he was not going to interfere with the State's case; that if the tape were admitted, it might cause the case to be reversed on appeal; and that they had gone beyond the realm of all propriety.
The trial judge's comment that if the video tape "comes in and it's inadmissible that anything we do here . . . may be reversed on appeal" does not constitute reversible error when viewed in isolation. Like the other comments of the trial judge, the prejudicial nature of this particular remark assumes significance when viewed within the context of the trial.
"Comments which tend to shift the jury's responsibility to another tribunal are inappropriate." United States v. Grimsley,419 F.2d 387 (5th Cir. 1969). "A statement by the court to or before the jury in a criminal case that if the jurors make a mistake in returning a verdict or finding of fact against the accused, it can be corrected by another authority, constitutes prejudicial error if it is apparent from the record that in all reasonable probability the jurors, with the thought that a correction could be so made, were remiss in the performance of the duty which the law places upon them as fact finders, to the detriment of the defendant." 75 Am.Jur.2d Trial § 99, at 200 (1974); Annot., 5 A.L.R.3d 974 (1966). See also Caldwell v.Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231
(1985).
Quite obviously, the trial judge should not have informed the jury that he would admit inadmissible evidence. In this case, this was more than a mere abrogation of judicial duty and responsibility. The events and circumstances of this case, including the prosecutor's repeated offers and withdrawals of those offers of the video, certainly allow or authorize the reasonable inference that the judge wanted the jury to hear and see the video tape. If we consider the judge's remarks as merely *Page 1030 
his attempt to dissuade the State from offering the video, we face the real and reasonable possibility that the jury may very well have concluded that that video contained incriminating, albiet inadmissible, evidence against the defendant. The judge's comment to the effect that defense counsel, the prosecutors, and himself had gone beyond the realm of all propriety concerning the video tape, could only serve to impress upon the jury the significance of that evidence and focus their attention on the fact that there existed additional evidence involving this case which they had not and never heard. See Ex parte Washington, 507 So.2d 1360, 1362 (Ala. 1986).
It is an understatement to comment that the situation presented here is unique. Somewhat similar is the case ofKissic v. State, 266 Ala. 71, 94 So.2d 202 (1957), where the accused was also convicted of murder. There, in the presence of the jury, the trial judge stated that, if either side requested it, he would call as his witness the remaining person who was present at the cutting and who had not testified. This was held to constitute reversible error because it afforded an unfair inference to be drawn from that failure to call a witness available to both parties. Kissic, 266 Ala. at 76,94 So.2d 202. See also Daniel v. State, 41 Ala. App. 405, 409-10,134 So.2d 752, cert. denied, 273 Ala. 706, 134 So.2d 757 (1961) (trial judge's statements that defendant was trying to introduce illegal evidence and that defendant had everything to gain and nothing to lose by introducing such evidence were prejudicial, requiring reversal).
Our reversal of the defendant's conviction is grounded upon the facts that we are convinced that the judge's comments constituted error and we are far from convinced that, without the insinuations, suggestions, and implications provided by those comments, the jury would have found that the State proved its case against the defendant. "[E]rror that might have been prejudicial in a close case does not require reversal when the evidence of appellant's guilt is strong." Boyd v. State,50 Ala. App. 394, 397, 279 So.2d 565 (1973). See also Ex parteHarris, 428 So.2d 124, 125 (Ala. 1983). The corollary of this rule is also true and applies here — where the evidence of the accused's guilt is slight or weak, though legally sufficient, the burden of showing probable prejudice from error will not be as great as in the case where the evidence of guilt is strong and substantial. "[M]atters that would be harmless error in some cases may be construed as reversible error where the scales are delicately balanced between guilt and innocence." 5 Am.Jur.2d Appeal and Error § 786, at 228 (1962), citing Glasserv. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680
(1942). "Overwhelming evidence of guilt does not render prejudicial error harmless . . ." Ex parte Lowe,514 So.2d 1049, 1050 (Ala. 1987).
In this case, we consider the judge's instructions to the jury insufficient to cure or eradicate the prejudicial qualities of his comments.
The general rule is that, where a jury was properly instructed, it will be presumed that it followed those instructions. Kennedy v. State, 472 So.2d 1092, 1105
(Ala.Cr.App. 1984), affirmed, Ex parte Kennedy, 472 So.2d 1106
(Ala. 1985), cert. denied, Kennedy v. Alabama, 474 U.S. 975,106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Mizell v. State, 184 Ala. 16,63 So. 1000, 1003 (1913) ("[I]f there was error in admitting the evidence . . ., it was cured by the exclusion of same."). In some cases, a cautionary instruction by the trial judge to the jury in his final instructions may be sufficient to cure the court's improper remark. Ex parte Lokos,434 So.2d 831, 833 (Ala. 1983).
Here, the trial judge's instructions were not sufficient to "cure" the error. Those instructions were cursory and not emphatic. See Poland v. State, 25 Ala. App. 213, 214,143 So. 209 (1932); Buckner v. State, 25 Ala. App. 361, 362, 146 So. 624
(1933). See also Renfroe v. State, 49 Ala. App. 713, 719,275 So.2d 692 (1973).
Those instructions were directed, for the most part, at the comments of trial counsel. Only in passing did the trial judge instruct the jury to disregard his own comments. *Page 1031 
"We doubt if under the facts in this case, the line of inquiry being given the prominence and scope and emphasis it was, if the court could have so withdrawn it from the jury as not to have injured the defendant. At any rate, the language used by the court in excluding the illegal testimony is too general and indefinite to cure the error in this case." Stephens v. State,17 Ala. App. 548, 549, 86 So. 111 (1920). "Necessarily, to a large extent (as has quite often been held by the courts), each case presenting this question must be decided upon the merits of the particular case under review, rather than on any general rule founded on the course adopted in antecedent cases. It is a settled general rule, nevertheless, that in each case nothing short of a direct and unequivocal charge from the court to the jury to disregard the illegal proof erroneously admitted is sufficient and likely to erase the impression and cure the error; for it is a matter of general as well as judicial knowledge that it is very difficult to eradicate from the mind of a jury the injurious impressions created by the admission of illegal testimony." Wills v. State, 15 Ala. App. 454, 456-57,73 So. 766 (1916). See also Cadle v. State, 27 Ala. App. 519,521-22, 175 So. 327 (1937). "It devolves upon the court, in matters of this important nature, to act with great care, and in a manner easily understood by the jury, to definitely, clearly, specifically, and comprehensively exclude the improperly admitted evidence, to remove as far as possible from the minds of the jury the prejudicial effect which the illegally admitted matter has probably worked." Wills,15 Ala. App. at 457-58, 73 So. 766. Although the cases cited above deal with the exclusion of evidence erroneously admitted, the legal principles are applicable here.
Here, it is the combined effect of the several remarks by the trial judge which give the individual remarks their prejudicial character. It is the repeated references before the jury to a video tape of the defendant which contained inadmissible evidence, coupled with the highly circumstantial nature of the State's case, which convince this Court that the defendant did not receive a fair trial. The comments made in Williams v.State, 34 Ala. App. 253, 260, 39 So.2d 29 (1948) reversed on other grounds, 251 Ala. 397, 39 So.2d 37 (Ala. 1948), cert. denied, 251 Ala. 696, 39 So.2d 39 (Ala. 1949), are appropriate and applicable here:
 "Appellate review of alleged infractions of these fundamental rights must be taken from facts reflected in the record and fair and reasonable inferences to be drawn therefrom. So, in the instant case, we make no charge that the trial judge or any one of the attorneys engaged in the trial was intentionally or purposely unfair or unjust to the accused. We cannot escape, however, the inevitable conclusion that on account of the many unfavorable occurrences throughout the progress of the trial the rights of the defendant were not made sufficiently safe and secure. We hold, therefore, that the judgment of the lower court must be reversed."
 III
At trial, a district supervisor for General Telephone Company demonstrated a pushbutton type of telephone that could be made to ring by dialing the telephone number assigned to that phone using that phone and immediately hanging up after dialing the number. He testified that the telephone line installed in the courtroom was a "B-1 touch call line," that the defendant had a "touch call" line serving his house, and that the courtroom line was the same type line as supplied to the defendant's house. The supervisor also testified that he did not "know what type of equipment he [defendant] had in his house, but he had a touch call line" which "has the capabilities of using a touch call telephone."
This demonstration was permitted over defense counsel's objection that "there is no evidence that he knows that that equipment down there is like this or if it was performing like he anticipates this to perform. . . ."
On cross-examination, the supervisor testified that he did not know what system the defendant had inside his house. *Page 1032 
Mrs. White's mother testified that she "believed" White used a push button phone. However, there was never any testimony that the particular telephone used by White would function in the manner described or that any touch call telephone on a touch call line would function in that particular manner.
The in-court demonstration should have been excluded. "[E]vidence of an experiment . . . is admissible if the conditions of the experiment were substantially similar to the conditions existing at the time of the occurrence involved in the litigation." C. Gamble, McElroy's Alabama Evidence § 81.01(2) (3rd ed. 1977). Here, the State failed to prove that the capabilities of the telephone used in the courtroom demonstration were substantially similar to those of the telephone used by White on the night of the murder. See Gilleyv. State, 367 So.2d 597, 599 (Ala.Cr.App. 1978), cert. denied,Ex parte Gilley, 367 So.2d 600 (Ala. 1979); Madden v. State,40 Ala. App. 271, 275, 112 So.2d 796, cert. denied, 269 Ala. 697,112 So.2d 800 (1959).
The allegedly fabricated telephone call was a key circumstance in the State's case against White. The jury should not have been permitted to assume that the capabilities of the telephone used in the demonstration and the one used by White were substantially similar. Because that assumption was permitted, White's conviction must be reversed.
This Court has found that White did not receive a fair trial because of the conduct and comments of the trial judge and because of the improper admission of an experiment or demonstration. The judgment of the circuit court is reversed and this cause is remanded for further proceedings.
REVERSED AND REMANDED.
All Judges concur.
[1] We recognize that the "hypothesis of innocence" language has been described as "confusing and incorrect," and has been abandoned in federal court. Holland v. United States,348 U.S. 121, 139-40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) ("There is some support for this type of instruction in the lower court decisions, . . . but the better rule is that where the jury is property instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect."); United States v. Bell,678 F.2d 547, 549, n. 3 (5th Cir. 1982), affirmed, 462 U.S. 356,103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence."Bell, 678 F.2d at 549. See also United States v. Andrews,765 F.2d 1491, 1500, rehearing denied, 772 F.2d 918 (11th Cir. 1985), cert. denied, Royster v. United States, 474 U.S. 1064,106 S.Ct. 815, 88 L.Ed.2d 789 (1986). Despite this, the "hypothesis of innocence" language is still employed by the courts of this state. Robinette, supra; Cobb v. State,495 So.2d 705 (Ala. 1985) (rejecting "all reasonable doubt" in favor of "a reasonable doubt").
[2] In an apparent attempt to obtain an incriminating admission from White, Enterprise Police Chief Tim Byrd had a police officer from Troy telephone the defendant at his residence and tell him that she had some information about the crime that would incriminate him. The defendant responded that if you have such information you should be talking to the police.
 *Page 7