BOWEN, Presiding Judge.
The appellant, Edward Lavon Spencer, was convicted of the murder of Willie Lee Hinton, Jr., and was sentenced to imprisonment for life. The only issue raised in this appeal is whether the evidence was sufficient to support the appellant’s conviction.
The evidence presented by the State can be summarized as follows: On the afternoon of March 28, 1992, the appellant and six other young men — Derrick Buford, Antonio Crosby, Laviron Evans, Michael Evans, De-mont Rox, and Kelenski White — gathered underneath a large oak tree located at the corner of Titi and Pecan Streets in an area of Mobile known as “the Bottom.” The young men apparently considered themselves a gang and called themselves the Disciples, but those members who testified indicated that they were not a part of the larger gang also known by that name. Compare A.D.T. v. State, 630 So.2d 165 (Ala.Cr.App.1993). The group or gang met frequently under this particular oak tree. On the afternoon in question, all of the young men except Lavi-ron Evans were drinking beer and wine.
Antonio Crosby testified that on this particular afternoon the appellant had in his possession a “small, one-shot, black-colored .22 [caliber] gun.” R. 48. Crosby stated that although this gun was an automatic, it did not “have a clip in the bottom of it” because the gun was “broken under there.” R. 56. According to Crosby, “in order to shoot the gun [after firing it once] you [would] have to break it down, take the bullet out, put another one in and put it back [together].” R. 56-57. Crosby also stated that the appellant’s gun did not always fire the first time the trigger was pulled — “It would click and if you [pulled the trigger] again it would fire.” R. 54. Crosby testified that while the group was at the oak tree, the appellant was “playing with” the gun and pointing the gun at “everybody, including himself.” R. 49. Crosby identified State’s Exhibit 1 as the gun that the appellant had in his possession that day.
Demont Rox testified that he also saw the appellant with a “black .22 [caliber] pistol” that afternoon. R. 111. Rox stated that he saw the appellant take the gun out of his pocket, “just h[o]ld it,” then put it back in his pocket. R. 112. Rox also identified State’s Exhibit 1 as the gun the appellant had in his possession.
Both Crosby and Rox testified that Michael Evans also had a gun in his possession that afternoon. Crosby described Evans’ gun as “a .32 or .38 caliber gun,” “a revolver type.” R. 53. Rox stated that this gun was a “.32 white pearl handle ... revolver.” R. 114.
After drinking beneath the oak tree for several hours, the seven young men walked to a nearby store to purchase some food. Upon leaving the store, the group walked down Ann Street, then turned onto Congress Street and walked along the sidewalk toward Davis Avenue.[1] Crosby indicated that the group was taking this circuitous route back to the oak tree in order to avoid a “confrontation” with a person or persons who had been in the store where the group had stopped. According to Crosby, the appellant and Michael Evans were walking together at the front of the group; Laviron Evans, Kel-enski White, and Demont Rox were walking together in the middle of the group; and Crosby and Derrick Buford were walking together at the back of the group.
Crosby and Rox stated that two men walking in the opposite direction approached the group and that there was an exchange of words between these men and those at the front of the group, although neither Crosby nor Rox knew what was said. Crosby testified that one of the men was then “down on the ground,” but he did not know if the man “was hit, pushed, or what.” R. 54. Rox testified that one of the men bumped into the appellant, that the appellant hit him, and that the man then fell to the ground. Crosby stated that the appellant pointed his gun downward and Crosby heard a click, then heard the gun fire. According to Crosby, at that time, the appellant was “[r]ight in front of the man.” R. 58. Rox stated that the appellant pointed his gun at the man, who *1271 was “cro[u]ched down, and that he then heard a shot. R. 112.
Crosby and Rox also testified that they heard Michael Evans fire his gun. Crosby testified that the man who had been with the victim ran away from the group and that “Michael [Evans] shot at him.” R. 57. Rox testified that he observed Michael Evans with his gun “pointed in the air” and that a “couple of seconds” later he heard a shot. R. 113.
When asked by defense counsel on cross-examination if he saw the victim “reach for his waistline,” Rox replied, “Right before [the appellant] shot him when he was cro[u]ched down. It appeared to me that he was reaching.” R. 122. At this time, the victim was “[a]bout three or four feet in front of [the appellant].” Id. On redirect examination, Rox stated that he did not see a weapon on the victim and that the victim “was almost all the way on the ground” when he was reaching for his waistline. R. 123.
On cross-examination, Crosby stated that he had consumed “about eight beers [and] half a gallon of wine” during the afternoon and that he was “[p]retty much” intoxicated at the time of the incident. R. 61-62. On redirect examination, Crosby testified that his consumption of this amount of alcohol “was an every day thing” and that he was “able to walk and talk without any difficulty.” R. 64. He also stated that the appellant did not appear to have any difficulty in walking or speaking.
Both Crosby and Rox testified that Michael and Laviron Evans were brothers and that Rox was their stepbrother. Crosby also stated that Derrick Buford was a cousin to Michael and Laviron Evans; Rox disclaimed any kinship to Buford.
Anthony Funchess testified that on the afternoon of March 28, 1992, he encountered the victim, whom he knew as B.B., “[o]n Adams Street in the general hang-out area.” R. 70. Funchess stated that the victim accompanied him to a local grocery store, where Funchess bought a bottle of wine, and then to another location, where Funchess purchased cocaine for $30. According to Funchess, he and the victim then walked along the sidewalk on Congress Street, drinking the wine that he had purchased in addition to liquor that each of them had had. Funchess said that, although the victim had wanted to stop at an abandoned house and smoke the cocaine, he had refused to do so.
Funchess testified that he “heard what [he] thought was a bunch of guys, really loud talking, sound[ing] real rough.” R. 72. Fun-chess stated that he told the victim that he was going to cross the street and that he then moved to the center of the street. When the victim said, “Damn them young boys” in a loud voice, Funchess went back to walk beside the victim because he did not want the victim to think that he “was afraid.” R. 72-73. Funchess testified that, as he and the victim came abreast of the group of young men, one of the young men said, “in a fast tone of voice, What do you mean by young boy?”’ R. 73. According to Fun-chess, this young man then hit the victim, knocking him down, and another one of the young men hit Funchess. Funchess stated that he spun away from the blow and ran away from the group. As he did so, he heard two shots. Funchess testified that when he looked back, he saw that the young men were running in the opposite direction, so he turned around and went back toward the victim. He stated that he saw the victim take a few steps, then fall to the ground. When he reached the victim, Funchess discovered that the victim had been shot. Fun-chess could not identify the persons who had struck him and the victim. According to Funchess, the victim did not have a weapon.
Dr. Gregory Wanger, the forensic pathologist, testified that the victim “died from a close-range gunshot wound.” R. 85. Dr. .Wanger stated that he had determined that the fatal shot was fired from close range by examining the shirt that the victim had been wearing. This shirt had “a small caliber gunshot [hole] in the left shoulder region ..., which was surrounded by a heavy deposit of black sooty gun powder residue-like material. That indicates that the muzzle of the weapon [wa]s relatively close in proximity to the surface of the clothing. For most handguns, you are talking about under two feet.” R. 88. Dr. Wanger testified that the bullet *1272 entered the left portion of the victim’s back, perforated his scapula and lungs, then exited through the right side of his neck. Although “[t]he projectile bullet was not in the body,” Dr. Wanger described the wound as a “small caliber gunshot wound.” R. 85.
When asked on cross-examination what he “mean[t] by small caliber,” Dr. Wanger replied:
“[W]e classify wounds in three broad categories. One is small. One is medium. One is large. The bullets that are usually associated with a small are the .22, .25 caliber, possibly .30 caliber sometimes. The middle group is usually the .357’s through .38, 9 millimeters, .380’s. And the large group is usually .44 or .45. Then there are a few calibers that are sort of on the border line.... These are the rough groupings that we use when we see the wounds.”
R. 88-89. Dr. Wanger also stated on cross-examination that the bullet traveled upward from the appellant’s back to his neck. He testified that at the time of his death the victim’s blood alcohol level was .283% and the victim’s blood and urine tested positive for cocaine. When asked what effect the alcohol and cocaine might have had upon the victim, Dr. Wanger stated that the victim’s “judgment and motor abilities would have been significantly impaired” and that, because “cocaine is a stimulant,” he “may have been excited.” R. 91.
Firearm and toolmark examiner Richard Carter testified that he examined the gun identified as State’s Exhibit 1 and found that “the weapon itself operates as designed,” but that the magazine was missing certain parts, and that the gun was therefore “a single shot weapon,” which “has to be reloaded each • time you are going to shoot it.” R. 96. Carter stated that while the gun was “marked .22 short,” it would fire “.22 short, long or long rifle” bullets. R. 98. Based on his examination of the clothing worn by the victim at the time of the shooting, Carter was of the opinion that the bullet hole in the clothing was made by a .25 caliber or smaller bullet. He also opined that, “based on the fact that there [were] gun powder particles and smoky residue present around the hole [in the victim’s shirt] and considering the small size of the hole,” the shot had been fired from “no farther than 18 inches and probably [from] less than a foot.” R. 101.
Sergeant Tyrone Williams of the Mobile Police Department testified that, on the night of the victim’s death, he interviewed Michael and Laviron Evans and then interviewed the appellant and Kelenski White. Sergeant Williams stated that he informed the appellant of his constitutional rights prior to' the interview and that the appellant signed a written waiver of rights form. Williams said that the appellant appeared to be under the influence of alcohol at the time of the interview, but that the appellant nevertheless appeared to understand what was said to him and that the appellant’s “[m]otor skills did not appear to be affected.” R. 147. Williams also stated that no one threatened the appellant and that the appellant’s waiver of his rights “appealed] to be free and voluntary.” R. 148. According to Williams, the appellant stated during this interview that he had not been present when the shooting occurred.
Sergeant Williams testified that he then interviewed other witnesses who indicated that the appellant “was the shooter, [that] he had the gun.” R. 150. Early on the morning of March 29, Williams again talked with the appellant. At this time, the appellant stated that he owned a .22 caliber pistol and that the pistol was at his residence. Williams testified that the appellant signed a consent to search form and that he, another officer, and the appellant then went to the appellant’s residence where he found a .22 caliber Beretta semi-automatic in the drawer of a dresser in the appellant’s room. Williams identified this gun as State’s Exhibit 1 and stated that the gun was loaded when he found it. Williams testified that he also found nine .22 caliber bullets in another drawer of the dresser.
Later that morning, at approximately 10:20 or 10:30 a.m., Sergeant Williams interviewed the appellant again. Prior to this interview, the appellant was advised of and waived his rights. This interview was tape-recorded and the tape was played for the jury at trial. In this interview, the appellant stated:
*1273 “We was walking down Congress and then we stopped by the store and then two guys were walking, and I was already ... down and everything, and they walked and one bumped me, and I had pushed him, then I just turned around and shot him. Then he fell.”
When asked during this interview by Sergeant Williams if his “basic reason” for shooting the victim was “because he bumped you,” the appellant replied, “Yes, sir, and I was ups and down [sic].” The appellant acknowledged that he had been drinking prior to the shooting and he explained that he was depressed “[a]bout [his] friend’s death and family problems.” The appellant also stated that Michael Evans fired his gun one time and he described Evans’ gun as a .38 caliber revolver.
On cross-examination, Sergeant Williams stated that no bullets were recovered at the scene of the shooting. He also testified that, when interviewed, Michael Evans had “stated that he didn’t own a gun, didn’t have a gun.” R. 172. Williams acknowledged that he did not attempt to obtain a search warrant for Michael Evans’ residence, despite the fact that other witnesses had informed him that Michael Evans had also had a gun at the time of the shooting. Williams further acknowledged that his report indicated that the appellant had stated at 6:30 a.m. that he did not shoot the victim, but that nothing in the report indicated that the appellant had stated at any time that he had not been present when the shooting occurred. Williams testified that he did not recall telling the appellant “that a gun more powerful than a .22 had to have been used to shoot [the victim] because a .22 bullet wouldn’t have gone all the way through him.” R. 182.
After the State rested, the appellant made a motion for a judgment of acquittal, alleging that the State had failed to prove a prima facie case. The trial judge did not rule on this motion. R. 185.
The appellant began his defense by recalling Antonio Crosby and establishing that Crosby had talked to Roy Adams, a Mobile police officer, on the morning of March 29, 1992. Crosby denied telling Officer Adams that “Michael Evans was the one that knocked down [the victim] and shot him.” R. 189. The appellant then called Officer Adams, who testified that Crosby had told him on the morning of March 29 that Michael Evans had knocked the victim down, that both Evans and another person in their group had “pulled a gun,” and that Crosby was not sure whose bullet hit the victim. R. 202. On cross-examination, Officer Adams testified that Crosby had specifically told him that “someone other than Michael Evans had pointed [his gun] at [the victim].” R. 204. However, he also stated:
“The best I recollect, what [Crosby] said was that once the man was on the ground Michael Evans pointed a gun at him, but he didn’t. give me in his direction [sic]. That he pointed the gun down in the area where this guy was down. The gun snapped and then it fired. But he did not know if the bullet hit the man on the ground or not.”
R. 205. Adams acknowledged that he had made no report on the matter and that he was testifying based solely on his memory.
The appellant also called Laviron Evans, who testified that both the appellant and Michael Evans “shot at” the victim at the “same time.” R. 213. . According to Laviron, the victim was not “on the ground” when the shots were fired. Id.
The appellant testified in his own defense. He stated that in March 1992, when he was 20 years old, he had had an alcohol abuse problem and that he had been drinking “[e]ver since [he] was 11.” R. 215-16. According to the appellant, he had consumed a large portion of “[t]hree or four half [gallons of wine] and about two cases [of beer]” on the afternoon and evening of March 28,1992. R. 224, 236.
The appellant stated that as the group was walking along Congress Street, two men approached them from the opposite direction. He testified that one of these men “bumped” him “and then said something.” R. 223. The appellant described the ensuing altercation as follows:
“[W]e had started arguing, cussing each other out and stuff. And I had pushed. That is when he hit me. Then I had shot. *1274 Then Mike [Evans] shot. Then he grabbed me and told me to come on.... Then we had ran home.”
R. 223.
The appellant’s testimony concerning the actual shooting was contradictory and inconsistent. On direct examination, he denied that he intended to shoot the victim and maintained that he pulled his gun “[bjecause [the victim] looked like he was going for something” and that he then “just shot.” Id. When asked why he had told Sergeant Williams that he shot the victim, the appellant replied, “Scared. I was scared.” R. 226. He then denied shooting the victim.
On cross-examination, the appellant stated that he “didn’t point” the gun before firing it; that he “d[id]n’t know where it was pointed”; and that he “just shot.” R. 231-32. He stated that the gun fired the first time he pulled the trigger. The appellant acknowledged that he did not see a gun or a knife in the victim’s possession, but maintained that he fired his gun because he was scared. He also averred that he “was drunk at the time.” R. 234.
In answer to the trial court’s questions, the appellant denied shooting the victim, while maintaining that he shot the victim to keep the victim from shooting him. He concluded, “I just shot, shot at him. I was scared.” R. 234. However, on further cross-examination by the prosecutor, the appellant denied shooting at the victim.
Upon concluding his defense, the appellant again moved for a judgment of acquittal. This motion was denied by the trial court. R. 241.
The appellant specifically contends that “[t]he evidence presented by the State is insufficient in that it failed to demonstrate that [he] was the person who fired the shot which caused the death of Hinton.” Appellant’s brief at 6. He asserts that, because there was evidence that both he and Michael Evans fired guns, “[w]ithout direct evidence that the bullet causing the death of Hinton was fired from [his] gun, there is a reasonable theory that Evans committed this offense.” Id. at 8. He then concludes that “[s]uch a theory is totally consistent with the reasonable theory that [he] is innocent.” Id.
While it is true that there was no direct evidence that the fatal shot was fired from the appellant’s gun, it appears that the appellant is confused as to the standards governing this Court’s review of the sufficiency of circumstantial evidence. Those standards are set forth in detail in Ex parte Bailey, 590 So.2d 354, 357 (Ala.1991), Ex parte Mauricio, 523 So.2d 87, 91-93 (Ala.1987), Dolvin v. State, 391 So.2d 133, 137-38 (Ala.1980), White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr.App.1989), and Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979), and need not be repeated here. Suffice it to say that “ ‘[i]t is not necessary for the circumstances to be “such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.” ’ ” White v. State, 546 So.2d at 1022 (quoting Mitchell v. State, 114 Ala. 1, 6, 22 So. 71, 72 (1897)).
“The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.”
Cumbo v. State, 368 So.2d at 874.
It was uncontroverted that the appellant was in possession of a .22 caliber handgun and that he fired this gun during an altercation with the victim. Three witnesses (Crosby, Rox, and Laviron Evans) testified that the appellant pointed his gun at the victim before firing. In his statement to Sergeant Williams, the appellant admitted shooting the victim. At trial, the appellant testified both that he did and that he did not fire at the victim.
Only one witness, Laviron Evans, testified that Michael Evans fired at the victim. Crosby testified that Michael fired at Anthony Funchess, while Rox stated only that he saw Michael point his gun into the air. Much more importantly, the gun in Michael Evans’ possession was, by all accounts, either a .32 or a .38 caliber revolver. The patholo *1275 gist testified that the victim died from a “small caliber gunshot wound.” He defined “small caliber” as .22, .25, and “possibly .30 caliber.” The firearms examiner testified that, in his opinion, the bullet hole in the victim’s shirt was made by a .25 caliber or smaller bullet.
Viewing the evidence in the light most favorable to the State, as we are required to do, Ex parte Bailey, 590 So.2d at 357, we conclude that the jury could have reasonably excluded every hypothesis except that of the appellant’s guilt. The conflicting evidence, the credibility of the witnesses, and the appellant’s claim of self-defense were all matters for the jury’s sole determination. See, e.g., Brown v. State, 588 So.2d 551, 559 (Ala.Cr.App.1991); Cannon v. State, 518 So.2d 872, 873 (Ala.Cr.App.1987); Waddle v. State, 473 So.2d 580, 582 (Ala.Cr.App.1985); Finchum v. State, 461 So.2d 37, 39 (Ala.Cr.App.1984).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.

. It appears that this street is also known as Martin Luther King Avenue.